OPINION OF THE COURT
David S. Ritter, J.
Defendant has moved to dismiss the indictment as a matter of law alleging that his neck was broken by correction personnel during five continuous days of systematic and brutal beatings at the Rockland County Jail. Moreover, defendant contends that he was denied necessary medical treatment for approximately 75 days after his neck was broken.
On November 7, 1983, I ruled that defendant was entitled to a posttrial hearing and an opportunity to establish that the alleged violations of his constitutional rights so tainted the prosecution’s case that dismissal of the charges is mandated.[1]
*133 Initially, I will summarize the facts that are relevant to defendant’s claim that he was the victim of official brutality. Defendant was one of a group of individuals jointly charged and ultimately found guilty of three counts of felony murder in connection with the October 20, 1981 fatal shooting of two police officers and a security guard following an aborted robbery of a Brink’s armored truck and a shootout with police at a roadblock. After the shootout, defendant jumped into the rear seat of a waiting tan Honda automobile. The Honda was being driven by one of the other participants in the robbery. Defendant crouched down along the floor of the rear seat as the Honda led police on a high-speed chase. The Honda ultimately crashed into a concrete barrier and the occupants were arrested. Defendant says he was semiconscious when he was removed from the rear seat of the Honda. He was immediately taken to Nyack Hospital and treated for injuries apparently caused by the accident. Medical records from Nyack Hospital indicate that defendant was given a cervical collar to wear, but X rays of the cervical spine were negative for any evidence of fracture as of October 20, 1981.
On the next day, October 21, 1981, defendant was discharged from Nyack Hospital and taken to the Rockland County Jail. At the posttrial hearing held on June 20, 1984, defendant testified that he was placed in a cell by himself. Soon after his arrival, defendant overheard some of the correction officers whispering about his alleged role in the robbery and shootings. A little while later several guards entered the cell and began hitting him repeatedly with police sticks and batons in the head and neck areas. The beatings continued for five consecutive days and were repeated as often as five to six times each day. Defendant cannot identify any of his assailants.
On October 26, 1981, defendant was transferred to the Federal correctional institute in Otisville, New York. He made daily complaints of severe pain that was caused by the beatings at the Rockland County Jail. The Otisville *134 medical staff treated him with pain killing medications, but X rays were not ordered until sometime in December, 1981, when defendant was examined by another doctor. The X rays show that defendant sustained a broken neck that could only have occurred while he was in custody.[2] Defendant required spinal fusion surgery that was performed in January, 1982, at the Westchester County Medical Center. After his discharge from the hospital, defendant was housed at a different State correctional facility. Although the Rockland County Jail would have been the usual place for defendant’s pretrial detention, he persistently sought to avoid being returned there because he claimed to fear that he would be beaten again. It was this fear, diagnosed by a team of attending psychiatrists, that led me to order him removed from the Rockland County Jail after he had been returned there during the trial. Based upon all of the evidence offered at the hearing just concluded, I find that the defendant has established that he was, in fact, a victim of brutality during his detention at the Rockland County Jail.
Defendant has not specified what evidence he claims was tainted by the beatings or any other official misconduct. The gravamen of his claim is that the official misconduct itself, namely, the brutality and violations of his right to counsel, were so egregious that dismissal is mandated as a matter of law. Defendant relies primarily on the fundamental constitutional concept of due process as interpreted by both the Federal and State judiciaries. In my view, defendant’s contention and the record before me also raise the question of whether the indictment should be dismissed in furtherance of justice pursuant to CPL 210.40.
Although I am satisfied that defendant’s constitutional and civil rights were violated, I do not believe dismissal is warranted as a matter of due process absent some causal linkage between the illegality and the evidence offered to secure his conviction (see Rochin v California, 342 US 165; People v Pobliner, 32 NY2d 356, 365). A causal connection is required because, as past decisions of the United States *135 Supreme Court demonstrate, “the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.” (Smith v Phillips, 455 US 209, 219.)
Fundamental fairness, which is the essence of due process, prohibits the government from exploiting any deliberate lawlessness on its part. Thus, an exclusionary rule has been fashioned to suppress the fruits of government misconduct and, in effect, obligates the prosecution to return an accused who has been aggrieved by the illegality to his status quo ante (see United States v Toscanino, 500 F2d 267, 275 [CA2d]).
In my judgment, défendant’s due process rights have not been violated because he has not demonstrated that any evidence offered by the prosecution at trial was tainted by the beatings. Apparently, the beatings in the Rockland County Jail were not motivated by the desire to acquire evidence that could be used against defendant at trial. Instead, he was the victim of individual acts of retribution against him for his perceived role in the killings of the two police officers.
While brutality, where established, cannot be condoned, appropriate sanctions are the subject of public debate. In its publication entitled ABA Standards for Criminal Justice, the American Bar Association devotes an entire chapter to the Urban Police Function and lists proposed sanctions for official misconduct. They are:
“(i) the exclusion of evidence obtained by unconstitutional means;
“(ii) criminal and tort liability for knowingly engaging in unlawful conduct;
“(iii) injunctive actions to terminate a pattern of unlawful conduct; and
“(iv) local procedures for handling complaints against police officers, procedures which usually operate administratively within police departments.” (ABA Standards for Criminal Justice, Urban Police Function, Standard 1-5.3.)
Notably, the ABA does not recommend the ultimate sanction of dismissal.
*136 The Supreme Court of the United States has, thus far, declined to bar a prosecution because of official misconduct unless the defense of entrapment has also been made out (see United States v Russell, 411 US 423). However, New York’s own Court of Appeals has imposed higher standards on police conduct under our State Constitution (see People v Isaacson, 44 NY2d 511; People v Archer, 68 AD2d 441, 446, affd 49 NY2d 978).
Isaacson (supra) is a rare and anomalous case which involves the basic elements of entrapment, but focuses on the conduct of the police as a more critical factor than the predisposition of the accused. In Isaacson, the prosecution’s evidence was so tainted by the official misconduct that dismissal was mandated as a matter of State due process. The numerous factors that prompted the Court of Appeals action in Isaacson, are clearly not involved in this case.
Although defendant was the victim of brutality and a civilized society should not tolerate this type of lawlessness, so drastic a step as dismissal “would increase to an intolerable degree interference with the public interest in having the guilty brought to book” (United States v Blue, 384 US 251, 255). Thus, the charges must be permitted to stand while alternate sanctions against the offending officials are sought (see People v Anthony, 60 AD2d 994).
Defendant’s motion to dismiss the indictment is denied.
[Portions of opinion omitted for purposes of publication.]

. The origin of evidence offered at trial may be explored at a posttrial taint hearing (see United States v Birrell, 269 F Supp 716; United States v Ostrer, 481F Supp 407). The reasons for taking action after trial rather than before are enumerated in Ostrer (supra, at p 415);
“First, defendants may be acquitted, obviating the need for any taint hearing at all.
“Second, because the defendants have not pointed to specific evidence which is tainted, they seek to hold the government to its proof at a pre-trial hearing that all of the evidence to be used has an independent legitimate source. This of course, would likely result in a protracted evidentiary hearing much longer than the trial itself.
“Third, at this [pretrial] stage, the specifics of the government’s case are only tentative and, of course, its rebuttal case cannot yet be framed. It would be a waste of judicial time to require the government to make its showing now on evidence which may never be offered * * *
“Fourth, criminal discovery is much more limited than civil discovery. The extensive *133 pre-trial hearing suggested by defendants would give them an unfair preview of the government’s case which would otherwise not be allowed.
“Finally, it is likely that this case will attract extensive pre-trial publicity. This may, of course, prejudice defendants’ right to a public and speedy fair trial.”

. This finding conforms with Judge Kevin Thomas Duffy’s observation that “the medical records raise a possibility that Brown suffered a second trauma after his arrest.” (United States v Shakur, 560 F Supp 318, 333, n 19.)