See also, 125 Misc.2d 132, 479 N.Y.S.2d 113, 136 A.D.2d 1, 525 N.Y.S.2d 618.

**Samuel BROWN, Petitioner,**

v.

**John DOE, Warden, Respondent.**

**No. 89 Civ. 2920 (VLB).**

United States District Court,
S.D. New York.

Oct. 16, 1992.

Robert N. Isseks, Goshen, N.Y., Alex Smith, Middletown, N.Y., for petitioner.

Janice Gittelman, Asst. Dist. Atty., Rockland County, New City, N.Y., for respondent.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

### I

This petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2241 and 28 U.S.C. § 2254 on behalf of petitioner Samuel Brown, presents many arguments grouped into twenty-one (21) points, many of them overlapping, as grounds for requiring reversal of his state court conviction. I defer decision on the grounds discussed in part IV of this memorandum order, and conclude that none of petitioner's other claims has merit.

Petitioner makes no claim of insufficiency of evidence or that the case against him was thin or, indeed, anything less than overwhelming. He argues, however, that his conviction should be vacated on the basis that no reasonable jury could have found guilt beyond a reasonable doubt. Point 18, Memorandum of Law on Behalf of Petitioner at 482–83. Petitioner grounds this argument on the following: 1) inconsistencies in eyewitness accounts—often a hallmark of truthful and nonrehearsed testimony; 2) press reports to the effect that the jury improperly shifted the burden to the defense; 3) unspecified omissions of pro-defense evidence in the prosecutor's summation; and 4) a request by one juror—unquoted and uncited—for more evidence prior to deliberations.

Petitioner has exhausted his state remedies with respect to the grounds raised in this petition. These grounds were rejected in state court on the merits in careful and well-reasoned opinions, upon both direct appeal and post-conviction applications.

The state courts found that petitioner was severely beaten prior to trial in the Rockland County Jail, resulting in a broken neck and that medical treatment other than painkilling medicines was delayed for more than a month, thus justifying removal of petitioner to another institution, but not affecting the validity of the conviction. *People v. Brown*, 125 Misc.2d 132, 479 N.Y.S.2d 113 (Westchester Co. 1984).

Part II below discusses the procedural and factual background for this petition, part III discusses various of the contentions of petitioner related directly or indirectly to the conduct of the trial and part IV addresses the issue of the due process and Eighth Amendment constitutional violations to which petitioner was subjected

prior to trial.[1] Those issues raised by petitioner which are not specifically discussed in this memorandum order do not entail federal constitutional violations which are factually or inherently legally prejudicial or inherently prejudicial under the circumstances of the case.

## II

On June 26, 1984 a New York Supreme Court jury convicted petitioner of three counts of felony murder, three counts of robbery in the first degree and other related lesser felonies. Petitioner was sentenced to 25 years to life on each of the three counts of murder, each sentence to run consecutively. Petitioner first appealed this judgment to the Appellate Division, Second Department, which affirmed the judgment of conviction. *People v. Brown*, 136 A.D.2d 1, 525 N.Y.S.2d 618 (2nd Dep't 1988). Petitioner sought further review of the decision by the New York State Court of Appeals, which was denied by order dated June 14, 1988, 72 N.Y.2d 857, 532 N.Y.S.2d 507, 528 N.E.2d 897. Petitioner also filed a petition for certiorari in the United States Supreme Court, which was denied on October 11, 1988, 488 U.S. 897, 109 S.Ct. 240, 102 L.Ed.2d 229.

In addition to his direct appeal, on March 18, 1985 petitioner filed a motion to vacate his conviction on the grounds of judicial bias, based upon the trial judge's campaign literature published after the judgment was entered. The motion was denied. Petitioner sought leave to appeal to both the Appellate Division and the Court of Appeals, which requests were denied, see 65 N.Y.2d 813, 493 N.Y.S.2d 1033, 482 N.E.2d 929 (1985). The United States Supreme Court denied certiorari on October 7, 1985, 474 U.S. 855, 106 S.Ct. 161, 88 L.Ed.2d 133.

There is no petition pending in any other court, state or federal, as to the judgment under attack. All of the grounds upon which petitioner's claims are based have been raised unsuccessfully in the state trial and appellate courts, and in the United States Supreme Court.

On October 20, 1981 a Brink's armored truck was robbed outside Nanuet National Bank at the Nanuet Mall in Rockland County. During the course of the robbery, two of the Brink's guards were shot, one of them fatally. The perpetrators fled the scene in a red van and a yellow Honda. The van was later exchanged for a U–Haul truck in the Korvettes shopping mall. A witness notified the police of the change in vehicles. The Rockland County Police were notified that the suspects were fleeing in a U–Haul and a yellow Honda.

The U–Haul was stopped by several Nyack police officers as it attempted to enter the New York State Thruway. While the officers were speaking with one of the U–Haul's passengers, Kathy Boudin, the back of the truck opened and six persons emerged firing automatic weapons at the police officers. Two police officers were killed and a third was wounded. When the shooting ended, Kathy Boudin was in custody, while all others escaped the scene.

South Nyack Police Chief Alan Colsey took up chase after a Honda fitting the broadcasted description of one of the escape vehicles, which was travelling at a high rate of speed a short distance from the scene of the shooting. The Honda, unable to negotiate a turn, crashed into a concrete retaining wall. Three persons, including Judith Clark, David Gilbert and petitioner Samuel Brown, were taken into custody; from inside the vehicle more than $800,000 was recovered.[2]

---

1. Page 1 of Petitioner's counsel's 499 page memorandum of law states that "each and every one of the following [twenty-one] points of argument involve violations of federal constitutional rights guaranteed to petitioner." Rather than discussing each of the 21 points separately, this memorandum order groups them by the constitutional provisions claimed to have been violated.

2. Petitioner was found wearing several layers of clothing and he had a loaded nine millimeter clip in one of his socks.

Other items were found in the front, rear and trunk of the car including: a nine millimeter automatic pistol, money bags, a ski mask, a bullet proof vest, and various articles of clothing.

While at Rockland County Jail, petitioner was severely beaten and received serious injuries, without being given adequate medical attention for a period claimed to be as long as 75 days. Petitioner's attorney, Susan Tipograph, asked at a preliminary hearing on October 23, 1981 that petitioner be moved to a hospital outside the jurisdiction of Rockland County, whereupon petitioner was moved to the Federal Correctional Institution at Otisville, New York and examined at Medical Intake Screening (Facts [submitted by petitioner] vol. 1 at 8–9).

During the initial pretrial period ending in July, 1983 (approximately eight months before trial began in March, 1984) petitioner was represented by attorney Evelyn Williams. Over Ms. Williams' disapproval petitioner decided to talk with Federal Bureau of Investigation agents at Otisville about the robbery. Not wishing to represent a cooperating defendant who disregarded her advice, Ms. Williams sought to withdraw as petitioner's counsel in or around January 1983 but was not permitted to do so until other counsel was substituted in July, 1983.

Robert N. Isseks was assigned to represent petitioner, and has represented him from July, 1983 until the present time. The change in attorneys resulted in delaying petitioner's trial and also in severing petitioner's trial from that of his co-defendants other than Kathy Boudin, who was offered and accepted the option to be tried with petitioner. Mr. Isseks moved on September 9, 1983 for relief of various kinds including dismissal of the indictment based on brutality against the petitioner while incarcerated, which was denied.

In 1982, petitioner and Ms. Boudin had moved for a change in venue, alleging that the prejudicial character and intensity of local publicity created an emotionally charged atmosphere rendering it impossible for the defendants to receive a fair trial in Rockland County. This motion was denied as premature. Prior to the commencement of the *voir dire*, petitioner renewed his application for a change of venue, and the place of trial was changed to Orange County. On the eve of trial, petitioner made another motion to change the venue to a larger metropolitan arena. The court denied the motion with leave to renew. After the initial screening of the veniremen, petitioner renewed the application for a change of venue. The motion was granted based on the totality of the circumstances including the nature and homogeneity of the community and the percentage of prospective jurors who expressed a firm opinion. The case was removed to Westchester County.

During jury selection defense counsel questioned the petitioner's mental and physical capacity to stand trial. Petitioner said he was experiencing pain and was apprehensive about his confinement during the trial in the Rockland County Jail, where his initial injuries discussed above had been received.

In March, 1984 the court ordered an examination of petitioner. Two psychiatrists performed the examination, Dr. Leslie Brooks and Dr. Edward Allen. They both agreed that petitioner should remain at the Westchester County Jail for a three week evaluation. In the meantime, jury selection continued. In April, 1984 a competency hearing was held. The court determined at the hearing that petitioner was capable of proceeding with the trial.

Meanwhile codefendant Kathy Boudin had pleaded guilty to second degree murder and first degree robbery. Petitioner moved for a mistrial. Judge West questioned the members of the jury on their knowledge of Boudin's guilty plea and its effect upon their ability to render a fair and impartial verdict, and then denied the motion. The trial was completed, and the jury found petitioner guilty.

On June 20, 1984 a post-trial hearing was held. There the court examined two issues: 1) whether the indictment should be dismissed because of the brutality petitioner suffered at the Rockland County Jail and 2) whether petitioner had been denied adequate legal representation prior to appointment of Mr. Isseks, even though Mr.

Isseks came into the case approximately eight months prior to trial.[3]

At that hearing, petitioner testified that during his first five days in the Rockland County Jail he was beaten three to six times a day by several corrections officers, that as result his neck was seriously injured and required surgery, and that he was denied medical treatment other than painkillers for 75 days.

With respect to the ineffective assistance of counsel, petitioner stated that he had been approached by Federal agents at the Federal correctional facility at Otisville; Special Agent Kenneth Maxwell stated that the meetings were held at petitioner's request. Petitioner signed a waiver form at the time of each of several interviews with federal law enforcement officers. As a result of petitioner's decision to proceed with these interviews Ms. Williams sought to be relieved as counsel. The testimony obtained was placed into evidence by the prosecution.

## III

*Right to Effective Assistance of Counsel*

■ Petitioner argues that the attorney initially representing him was not interested in representing his individual interests and represented him only to the extent that the representation advanced the revolutionary cause advocated by petitioner's co-defendants. He claims, in short, that his attorney had a prejudicial conflict of interest. As discussed below, counsel was changed long before trial. His new attorney, who still represents him, had sufficient opportunity to prepare for trial—adverse effects of the claimed conflict were obviated.[4]

■ Petitioner alleges that state and federal officials used his sufferings from his injuries and assertedly distorted advice from counsel, to further attempt to segregate and isolate petitioner from his legal counsel. Petitioner contends that during this "vulnerable" period, the FBI agents engaged in a variety of unethical and unlawful conduct, holding up needed medical treatment to gain petitioner's cooperation, and branding him as a FBI informant effectively to arrest any further desire on the part of his revolutionary attorney to continue representation.

In this regard, the primary thrust of petitioner's complaint appears to focus on asserted denial of effective counsel, not on any contention that the state court improperly admitted evidence of petitioner's statements to the FBI after holding a hearing on that subject at which the state court found petitioner initiated contacts with the FBI and formally waived counsel at each meeting with the agents.

Petitioner's claim of inadequacy of counsel in connection with the FBI interviews is internally inconsistent since the legal advice he received from an attorney who abhorred cooperating defendants would have been *not* to cooperate, rather than propelling petitioner toward talking with FBI agents.

Petitioner admitted at a public hearing on January 6, 1983 in Rockland County Supreme Court that he had contacted federal authorities on his own initiative to offer to testify before a federal Grand Jury, and he also acknowledged that no bargain was struck or promised by the federal authorities to gain his cooperation. (Tr. Jan. 6, 1983 at 11–12). Petitioner expressly waived his right to counsel each time he was interviewed by FBI agents (Tr. May 1, 1984 at 18–21).

■ It would be impermissible to allow a criminal defendant who consciously chooses to disregard legal advice to be able to turn around and successfully claim that

---

3. The hearing had been ordered in November, 1983 before the trial, in response to defendant's motion to dismiss the indictment on the aforementioned grounds.

4. To accept a claim of this type would provide the means whereby so-called revolutionary counsel would offer a client a virtual guarantee

against conviction: if the case went against the client, it could be blamed on the convictions of counsel, whereas refusal to permit such counsel to represent a defendant who retained or requested such counsel would constitute a denial of the right to counsel of one's choice.

this decision by the defendant himself destroyed the adequacy of legal representation, justifying release from imprisonment after a verdict of guilty.

■ Moreover, any disadvantage suffered by disagreements between petitioner and his initial counsel came to an end in July, 1983, long before trial began in March 1984. New counsel had ample opportunity to make any requests or objections necessary to correct any prior prejudicial events. Only if the state court's rulings on petitioner's requests for relief based on alleged prior inadequate representation or other events violated the federal Constitution could federal habeas corpus relief be justified. I decline to assume, in the absence of evidence to that effect, that delay between the crime in 1981 and trial in 1984 (occasioned in part by successful defense efforts to obtain changes of venue) caused inability of petitioner to recall events or obtain needed evidence. Certainly such a delay, absent other factors, would not constitute a federal constitutional violation which would justify petitioner's release.

In view of adequate trial representation and opportunity to move to correct any prejudice from previous occurrences, petitioner's Sixth Amendment claim cannot be an independent ·basis of relief upon the present petition.

■ Aside from the above analysis which assumes that petitioner's initial counsel was inadequate, claims of ineffective assistance of counsel are governed by the two prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Petitioner must demonstrate that his counsel's performance was deficient and that the errors made were not in the realm of reasonableness. *Id.* at 687–88, 104 S.Ct. at 2064. There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and that counsel made "all [the] significant decisions in the exercise of reasonable professional judgment." *Id.* at 690, 104 S.Ct. at 2066.

Petitioner must also prove that there was a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068.

For petitioner to talk with federal agents while in custody may or may not have been in his interest. If his right to counsel had been violated by the interrogation, Sixth Amendment relief might be justified. Here, however, petitioner's counsel, rather than seeking a court order to bar further interrogation, registered disapproval to petitioner of his decision to talk with the agents—thus confirming the reliability of the formal waivers executed by petitioner in connection with his interviews by the FBI.

■ Assuming *arguendo* that petitioner's Sixth Amendment right had attached, the state court reasonably found that petitioner initiated contacts with the FBI agents and that there was a valid waiver on each occasion petitioner spoke with the federal agents. *People v. Brown*, 136 A.D.2d 1, 11, 525 N.Y.S.2d 618 (2d Dept.), *review denied* 72 N.Y.2d 857, 532 N.Y.S.2d 507, 528 N.E.2d 897 *cert. denied* 488 U.S. 897, 109 S.Ct. 240, 102 L.Ed.2d 229 (1988).

### Ability to Stand Trial

■ Petitioner alleges that the trial court improperly drew a distinction between incompetency caused by a "mental disease or defect" and incompetency caused by "physical pain".

No federal violation appears to exist with respect to this issue. A full competency hearing was held at a time when petitioner had counsel not claimed to have been inadequate, resulting in reasonable factual findings, upheld on appeal; the appellate court specifically noted that "the trial court did consider the defendant's contention that ... pain ... caused .him to be unable to assist in his ·defense, and dealt with the issue satisfactorily by informing the defendant that if there came a time when he considered himself unable to continue, a recess would be taken." *People v. Brown*, 136 A.D.2d at 12, 525 N.Y.S.2d 618 *supra;* see Tr. April 25, 1984 at 82.

### Continuation of Trial During Further Evaluation

Petitioner alleges that the trial court's continuation of his trial while he was under psychological evaluation violated his due process rights. Petitioner supports this contention through the following statement by examining psychiatrists as of March 23, 1984, quoted in the state's Memorandum of law at 83:

> Although Petitioner was getting along well with his lawyer [and] understands the nature of the charges against him and the court procedure, ... he does not appear to have sufficient ability to consult with his lawyer because of his severe depression and his extreme preoccupation with his jailers ... [H]e may not be able to cooperate with his defense at all times.

As a result of this finding, a request by the psychiatrists was granted for a three week period of intense observation. During the observation period the initial pre-evidentiary and pre-opening phase of the criminal proceeding continued, involving jury selection and pretrial judicial hearings. Petitioner contends that this continuation violated his due process rights.

No finding of incompetency or inability to assist counsel was ever made; the psychiatrists only requested an additional observation period which was granted, thus creating a risk to the state that if an adverse finding had been made, a mistrial might have been necessary and, indeed, double jeopardy problems created. The final favorable judgment on competency was made at the end of April (Tr. April 25, 30). No authority has been cited establishing that it matters at what point during trial the judgment on competence is made.

### Access to Expert Services

Petitioner claims that he was denied the right to expert services. In *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) the Supreme Court granted access to reasonable and necessary services by the indigent, in addition to counsel, as a right of constitutional dimension:

> [w]hen a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own.

*Id.* at 83, 105 S.Ct. at 1096.

In the present case, petitioner was not only examined by psychiatrists he did not have to pay, as discussed earlier, but permitted to select his own psychiatrist, Dr. Eshkanji. It was only after Dr. Eshkanji determined that "no mental disease or defect prevents him [petitioner] from understanding the nature of the proceeding and assisting his counsel," Tr. April 25, 1984, at 230, that petitioner appears to have complained of Dr. Eshkanji's examination.

### Change of Venue and Pre-trial Publicity

Petitioner asserts that denial of his request to change venue from Westchester County, and the impact of publicity about the crime and Kathy Boudin's guilty plea, violated due process. This claim must be evaluated in the light of changes in venue petitioner requested and received from Rockland to Orange County [5] and then to Westchester County, at which time "defendants ... conceded that Westchester County is an appropriate site for their trial, agreeing that its population is of sufficient size and heterogeneity to ensure the selection of a fair and impartial jury," *People v. Boudin*, 97 A.D.2d 84, 86–87, 469 N.Y.S.2d 89, 91 (2d Dept.1983).

Moreover, defense counsel at the trial initially declared the jury satisfactory without further challenges for cause until the court directed the jury be sworn, at which point two further challenges were made. Tr. May 15, 1984 at 182–83.

---

**5.** *People v. Boudin*, 90 A.D.2d 253, 457 N.Y.S.2d 302 (2d Dept.1982).

■ With respect to the impaneling of jurors, unless governmental authorities are affirmatively responsible for substantial, widely reported and prejudicial adverse publicity,[6] or protection against prejudice arising from publicity emanating from other more general sources is inadequate, convictions cannot be set aside merely because of the notoriety of the crime involved.

The case of *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) is the single most illustrative case concerning harmful pre-trial publicity. In that case, Sheppard was convicted of killing his wife. For a five month period between her death and the trial, he was subject to constant attack by the media. During the nine week trial, at which the jury was not sequestered, the barrage of inflammatory media coverage continued. After reviewing the "totality of the circumstances" the Supreme Court determined that the judge's refusal to take precautions against the influence of pre-trial publicity, combined with the extremely inflammatory atmosphere of the trial, deprived Sheppard of a fair trial. *Id.* at 354–55, 86 S.Ct. at 1518. The obvious care of the New York courts, granting two successive changes of venue, and leading to a jury found acceptable to petitioner insofar as challenges for cause are concerned, is in sharp contrast to the kind of facts required for vacating a conviction.

### Boudin's Guilty Plea

■ Petitioner concedes that a guilty plea of a codefendant does not mandate a mistrial and that a showing of prejudice is required. Petitioner's Memorandum of Law at 397. No specific showing of any kind of actual prejudice has been presented, nor is there any claim that specific

precautions other than mistrial were sought and denied. Id. 397–98.

### Security at the Westchester County Court

■ Petitioner claims that he was unfairly prejudiced by the security at the Westchester County Court. In *United States v. Gambia,* 564 F.2d 22, 24 (8th Cir.1977) the court stated that "a defendant is entitled to the physical indicia of innocence, otherwise the legal presumption of innocence may be weakened." However, "the necessity of courtroom security sometimes outweighs a defendant's right to stand before the jury untainted by physical reminders of his status as an accused." *Allen v. Montgomery,* 728 F.2d 1409, 1413 (11th Cir.1984).

In the instant case, parties potentially involved in the Brinks robbery were at large. The proceedings were a potential target for revolutionary violence. And as a one-time FBI informant, petitioner could also have been a target. Moreover, the court described in detail the nature of security to the jurors. The court took all necessary steps to avoid creating an impression of prejudged guilt on the part of the defendant. In one instance, the court ordered that all marked police units situated outside the building be removed to inconspicuous locations out of view of any prospective juror.

### Petitioner's Jury Challenges

■ Petitioner complains of the rulings the trial court made on challenges for cause to prospective jurors and the Court's refusal to award a mistrial. Many of the prospective jurors had heard of the case or of security precautions but none indicated an inability to be impartial. See Petitioner's Memorandum of Law at 418–24. Peti-

---

**6.** Examples given in the petitioner's counsel's highly detailed memorandum of law of petitioner (Point 14 at 466–68) while suggesting impropriety, do not appear to have been part of a deliberate campaign of prejudicial publicity against petitioner, or to have been frequent or widely reported in Westchester County in a way which might be likely to influence a jury.

 Injunctive relief might have been sought at the time. But petitioner does not claim to have

requested a judicial prohibition on further statements by the prosecutor or that such a request was denied. Petitioner appears to have sought mistrials or changes of venue, but by contrast does not claimed to have sought action to stem the flow of assertedly prejudicial publicity— thus perhaps seeking to take advantage of it rather than moving to stop it.

tioner makes no claim that further probing was requested and refused, id. 417–428. General knowledge which can be set aside based on facts proved or not proved at trial is present in nearly every case of any notoriety. Thus petitioner must show actual bias to establish a basis for setting aside his conviction under the federal Constitution. *Murphy v. Florida,* 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975).

As stated in *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961):

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

Here, no such preconception was shown even in the first instance. Petitioner's argument is further diminished by the position his counsel took at the opening of the trial. Petitioner's counsel conceded in his opening statement almost every fact with respect to which the prosecution would eventually introduce evidence: 1) that petitioner was at the Nanuet Mall at the time of the robbery; 2) that petitioner was at the Korvette's switch-point where the vehicles were exchanged; 3) that petitioner was at the scene of the mountainview shootout; 4) that petitioner fled the scene with the two other participants; and 5) that petitioner was arrested and a nine millimeter clip of ammunition was found in his sock.

Petitioner cites *Sims v. United States,* 405 F.2d 1381, 1384 (D.C.Cir.1968) and *United States v. Allsup,* 566 F.2d 68, 71 (9th Cir.1977) for the proposition that any relatives of police personnel should have been excused. Petitioner cites no authority, however, for the proposition that seating such persons as jurors without excusing them for cause is an inherent federal constitutional violation.

Avoiding the seating of jurors even remotely connected with anyone with characteristics similar to alleged victims in a criminal case may doubtless be the better practice as a general proposition. Federal constitutional interpretation cannot, however, ignore countervailing factors such as a situation where in a proper venue, which petitioner conceded was present here, the court may be able to determine that a juror, despite connection with members of a group from which an asserted victim was drawn, would recognize that convicting the wrong person for a crime against a person for whom the juror has sympathy would hardly vindicate the need for protection of such persons. A court is surely able to recognize a situation where excusing potential jurors too readily might tend to make it difficult to empanel a jury at all.

### Prosecutor's Conduct

■ Petitioner asserts that the prosecutor acted improperly in making statements to the press concerning the trial, but failed at the time to ask the court to prohibit such statements, which although objectionable in some instances, appear minor in terms of coverage in Westchester County, number and likely impact. Moreover, as indicated earlier, petitioner made no attempt to stop the statements as opposed to relying on them to obtain a mistrial, delay of trial, or vacatur of his conviction.

■ Petitioner further alleges that the prosecutor's failure to investigate the police misconduct at the Rockland County Jail is grounds for a reversal of his conviction. The reasons for the prosecutor's failure to act at the time are not known. Petitioner, however, does not claim to have asked the court to request the Attorney General or the Governor to appoint a special prosecutor or to initiate an independent investigation, or that any such request was refused.

Dereliction of duty by a specific prosecutor has never been held to present a federal constitutional justification for ordering the release of a prisoner otherwise properly convicted. The question, however, of whether the state as a whole has taken adequate steps to deal with the illegal be-

havior which occurred in the Rockland County Jail involving petitioner is a matter of concern and is discussed in part IV.

### Withholding of Exculpatory Evidence

Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) holds that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87, 83 S.Ct. at 1197.

Petitioner argues that the Court's decision not to disclose the names of 180 non-testifying witnesses who made statements to the police for purposes of pre-trial hearings was in violation of his constitutional rights to due process of law. But the court ordered the prosecution, upon petitioner's application, to turn over all statements made by non-testifying witnesses, redacted only to exclude the names and addresses of the witnesses. Dec. & Order, Dec. 7, 1982. After reviewing these statements, it ordered the State to turn over to the defense the names and addresses of eleven of those witnesses.

Where risks may attend disclosure of information asserted to be important to a case and subject to production, in camera review of this type is traditional and widely accepted, e.g., United States v. Zolin, 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989).

### Suppressed Evidence

Petitioner contends that the prosecution used suppressed evidence which prejudiced his trial and swayed the jury. In particular, the prosecution used the eyewitness testimony of one Ms. Priest, who identified petitioner at a line-up, although that identification was suppressed.

The incident petitioner refers to is based solely on the following question and answer:

Q. Did you have occasion on the 15th day of April of the year 1972 to attend a line-up proceeding that took place in Monroe, New York at the State Police Barracks?

A. Yes, I did.

The court immediately raised the matter at the side bar, the question was withdrawn and no further questions were asked; indeed, the District Attorney never asked, and made no mention of, what happened at the line-up. It is implausible that such a non-answered question not containing the defendant's name could have had any significant impact as part of the trial. Whatever error may have been involved was harmless beyond a reasonable doubt.

### Curtailing of Petitioner's Summation

Petitioner alleges that the limitation on his counsel's summation violated due process. The trial court limited each of the summations to two hours in length. But this limitation was based on statements made by both sides that they would need only two hours for summation.

Petitioner further alleges that his counsel, Mr. Isseks, was forced to rush his summation and as a result, it was incoherent and poorly presented. He contends that Judge Ritter cut off Isseks' summation.

All that actually took place, however, appears to have been a judicial instruction to focus on issues in dispute, indicating that a limitation might be imposed in the future if this did not occur. After the luncheon recess, Isseks was given forty-five minutes more.

In Herring v. United States, 422 U.S. 853, 858, 95 S.Ct. 2550, 2553, 45 L.Ed.2d 593 (1975) the Supreme Court stated: "[T]here can be no doubt that closing argument for the defense is a basic element of the adversary fact-finding process in a criminal trial." The Herring Court struck down a statute which prevented any closing argument in a non-jury trial. However, it has never been suggested that summations must be indefinite in length and time. The New York Appellate Division, Second Department, determined that a trial court's limitation of a defendant's summation to one hour did not constitute an abuse of discretion. People v. Dermerritt, 113

A.D.2d 898, 493 N.Y.S.2d 626 (2d Dep't 1985) (rape case). There is no indication from the record or from petitioner's memorandum that any limitation prejudiced petitioner or was claimed to have prejudiced the jury.

### Impartiality of the Presiding Judge During Trial

██ Petitioner contends that Judge Ritter was biased, and as a result petitioner was deprived of his constitutional right to a fair and impartial tribunal. This argument is based on two prongs: (1) subsequent campaign literature mentioning the case, and (2) various rulings claimed to have been difficult to explain but not independently argued to have been violative of federal rights.

Petitioner places heavy emphasis on the argument that Judge Ritter tried to keep the case out of the limelight until it was transferred to Westchester. There are a number of reason why Judge Ritter might have kept matters away from the press in Goshen and not in Westchester. For example, when the trial was transferred to Westchester a related federal trial had already begun. Therefore, a number of hitherto undisclosed facts had become part of the public record. One cannot assume that keeping a criminal matter out of the limelight to the extent possible at any stage of the proceedings is inherently suspect. It would be improper publicity permitted in Westchester despite any applications for relief to prevent it, seemingly absent, which would be relevant here.

Many of the specific instances cited (Petitioner's Memorandum of Law at 451–466) are stated without specific references to the record, despite the two volumes of factual extracts submitted by petitioner, and are accompanied by pejorative characterizations rather than relation of concrete facts, e.g., "Judge Ritter's attempts to distort the record," id. at 486, and his "willingness to misuse precedent," id. 461.

### Post–Trial Judicial Election Campaign Literature

██ Judicial impartiality has long been a cornerstone of our system of justice, see *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988); *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986); *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927); see also *In re Drexel Burnham*, 861 F.2d 1307 (2d Cir.1988). In part to assure this, the Framers in Article III of the federal Constitution provided for a judiciary protected by life tenure during good behavior. The nonelective federal judiciary supports the democratic process because the appointing and confirming branches consist of elected officials and the length of term helps to protect constitutional guarantees from short-term swings of opinion, leaving their ultimate impact to the "sober second thought of the community," Stone, "The Common Law in the United States," 50 Harv.L.Rev. 4, 25 (1936).

Judges at the state level have, however, been elected since the establishment of the Republic. Elected state judges have the advantage of closeness to the People, but must and do exercise the courage of independent judgment even when the rendering of unpopular decisions becomes their duty.[7] At the same time, knowledge of what rulings are likely to be popular is inescapable, and in a system in which judges are elected, there is an incentive to utilize popular positions for electoral advantage. Nevertheless, direct exploitation of the popularity of judicial conduct in a criminal case may tend to erode the appearance if not necessarily the reality of impartiality with ill effects on ultimate public confidence in the fairness of criminal justice.

Accordingly, use of petitioner's case as part of a judicial election campaign waged by the trial judge shortly after the sentenc-

---

**7.** The same challenge is presented to legislators according to 10 *Correspondence of Edmund Burke* 40–41 (1978 ed):

"I do not know nor have I ever heard of any Law whatsoever, either by positive Statute or parliamentary usage, which requires a Member of Parliament to obey the orders of a Majority of ... constituents ... if I had received such orders, neither Law nor reason could bind me to the smallest attention to them."

ing of petitioner (Memorandum of Law on behalf of petitioner at 436–38) is necessarily a matter of concern. The discretionary nature of many trial rulings, the ability to appeal from the final judgment and the role of the jury as factfinder, do not dilute the need to insist on the absolute necessity for the impartiality of members of the judiciary.

 Use of a trial in a judicial election contest occurring after the trial cannot directly establish any right of petitioner to release. Nor is it possible in this instance to infer retrospectively that the trial judge conducted the trial with an eye to future benefit. On the other hand, in the future, overt use of a trial to enhance the electability of the jurist presiding at the trial can in a clear enough case become a ground for considering *habeas corpus* relief. Flagrant disregard of such a prospective rule—especially if called to the attention of the jurist involved during or at the outset of the trial where counsel believes such a conflict of interest may exist [8]—would add to the strength of a possible backward-looking inference [9] that electoral considerations had outweighed judicial ones during the trial.

In the present case, the collection of assertedly improper rulings complained of by petitioner, in many instances not supported by record references (see Memorandum of Law on behalf of Petitioner at 451–466), do not add up to evidence or corroboration of actual bias.

### *Jury Charge*

 Petitioner claims that the judge charged the jury in a light more favorable to the prosecution. After petitioner took exception, the judge supported his charge on the grounds that petitioner failed to make a specific request to have exculpatory inferences cited in the charge. Petition-

er also contends that the court made misstatements in the jury charge.

A jury charge in a state trial "is normally a matter of state law, not reviewable on federal habeas corpus absent a showing that the alleged errors seriously deprived Petitioner of a right guaranteed by the Fourteenth Amendment." *Glucksman v. Birns*, 398 F.Supp. 1343, 1351 (S.D.N.Y. 1975) *citing Cupp v. Naughten*, 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973).

The record shows that the judge instructed the jury with favorable inferences to support petitioner's innocence. The court offered the following instruction with respect to the ski mask and bullet proof vest:

> ... common experience teaches that even when an innocent person finds himself placed under suspicion or in danger, may [sic] instinctively or protectively resort to conduct which may create an appearance of guilt in order to avoid arrest, criminal prosecution or bodily injury.

Tr. June 13, 1984, at 45 *cited in* Respondent's Memorandum at 144. While the court's summary of the prosecution's evidence was more extensive, this reflected the difference in the number of witnesses presented.

Where petitioner objected to possible misconstruction of the charge as indicating that petitioner possessed a gun, the court stated the following:

> The contents of the Honda include a bullet proof vest and a gun. Now, what role they played in this case and what connection, if at all, they had to Mr. Brown ... is for you to determine.

Tr. June 13, 1984, at 86.

There is no indication that the charge suggested guilt on the part of petitioner or was in any way constitutionally improper.

---

**8.** Making such an argument without causing offense may be a delicate matter, but counsel placing such a point on the record may properly indicate that it is done merely to protect the client's rights and to avoid criticism for failing to do so, not because counsel expects that any such problem would in fact exist in the case at hand.

**9.** In most instances, retrospective inferences where drawn have been based on overall patterns of consistent behavior extending over periods including those covering events in dispute, e.g. *Eatz v. DME Unit of Local Union No. 3*, 794 F.2d 29 (2d Cir.1986); see also *Phoenix Canada Oil Co. v. Texaco*, 842 F.2d 1466, 1478 (3d Cir. 1988).

### "The Evidence Did Not Support a Finding of Guilt Beyond a Reasonable Doubt...."

■ Point 18 in the Memorandum of Law on behalf of Petitioner at 492 as quoted immediately above is somewhat of a misnomer, since petitioner in this case does not assert inadequacy or absence of evidence. Instead, Point 18 seeks release of petitioner on the ground that no reasonable jury could have found guilt beyond a reasonable doubt because of 1) inconsistencies in eyewitness accounts; 2) a news article suggesting that the jury may have placed a burden on petitioner, 3) omissions of pro-defense arguments in the district attorney's summation, and 4) an uncited reference to one juror asking for more evidence before retiring.

None of these arguments relates to sufficiency of evidence or shows a federal constitutional violation. See generally *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

Juries have the function of assessing credibility of testimony including its inconsistencies. *United States v. Singh*, 628 F.2d 758, 766 (2nd Cir.1980).

### Double Jeopardy or Cruel and Unusual Punishment

■ Petitioner claims that the imposition of three consecutive 25 year-to-life sentences constitutes double jeopardy, and cruel and unusual punishment. Petitioner argues that under New York law it is improper to impose consecutive sentences on a defendant when the crimes were predicated on the "same set of facts."

In *United States ex rel. Annunziato*, 440 F.2d 304 (2nd Cir.1971), it was held that sentencing of a state prisoner is governed by state law and may not be attacked on collateral federal habeas corpus.

Moreover, the state courts reasonably found that "each act of murder was separate and distinct, and 'neither was a material element of the other[s]'". *People v. Brown*, 136 A.D.2d 1, 17, 525 N.Y.S.2d 618 (2nd Dep't 1988).

### Equal Protection

■ Petitioner claims that the plea bargain offered to Kathy Boudin[10] but not to petitioner brought about a denial of equal protection.

■ The Equal Protection Clause ensures "that equal protection and security should be given under like circumstances ... and that in the administration of criminal justice no different or higher punishment should be imposed upon one than such as is prescribed for all like offenses." *Barbier v. Connolly*, 113 U.S. 27, 31, 5 S.Ct. 357, 359, 28 L.Ed. 923 (1885). This does not invalidate differences in sentences so long as the statutory prescription is the same, there is a rational basis for whatever is done, and no invidious discrimination triggering heightened scrutiny is involved—which is not claimed here. Here, the prosecution contended that Boudin was an accomplice but did not actually fire a weapon, whereas petitioner was claimed to have murdered two victims—obviously a rational justification for seeking differential sentences.

### Limitations on Petitioner's Brief

■ Due process assures every defendant "a fair opportunity to obtain an adjudication on the merits" of an appeal. *Evitts v. Lucey*, 469 U.S. 387, 405, 105 S.Ct. 830, 841, 83 L.Ed.2d 821 (1985). Petitioner claims that the Appellate Division, Second Department, violated this guarantee by limiting petitioner's brief to 200 pages and oral argument to 45 minutes.

Petitioner fails to point to any specific argument which was not adequately presented, thus prejudicing petitioner. Moreover, the Appellate Division showed sensitivity to petitioner's claim that more extended treatment than that ordinarily permitted was required to present his case.

Section 670.17(a) of the Rules of Court for the Second Department provided:

In all causes, unless approved in writing by a justice or the Clerk of the Court,

---

**10.** Boudin was given 20 years to life.

any brief submitted by a party will not be accepted for filing:

. . . . .

(2) if it contains more than 50 pages of standard typographic printing or 70 pages of printing by any other process of duplicating or copying ...

In the instant case, petitioner was permitted to file a brief which was 150 pages over the statutory limitation.[11] He has submitted no authority which indicates that this limitation is unconstitutional.

### Other Claims

Petitioner's other claims not specifically discussed here, have been considered and found not to provide a federal constitutional basis for releasing petitioner or vacating his state court conviction.

### IV

The trial court found that petitioner suffered a broken neck while in custody. The court accepted that petitioner was a victim of brutality during his detention but found no causal link between the official misconduct and the evidence offered to convict petitioner. *People v. Brown*, 125 Misc.2d 132, 479 N.Y.S.2d 113 (Westchester Co. 1984). While no such link has been established, concern must remain that official misconduct may be encouraged if known violence of the nature involved here is ignored and thus in effect condoned where no exclusionary remedy is appropriate and no criminal or damage sanction has in fact been imposed.

Undoubtedly the Framers of the Constitution and its amendments sought both to protect the people from official torture and to establish a government of laws under which the public would be protected from private criminal activity. Both types of depredation destroy the right to life, liberty and the pursuit of happiness, deny life and liberty without due process, and remove the blessings of domestic tranquillity.

Thus law enforcement is constitutionally required to be both effective and fair.

Violence against prisoners is a matter of particular concern, especially given events in totalitarian states in this century. In *Chambers v. Florida*, 309 U.S. 227, 236–37, 60 S.Ct. 472, 477, 84 L.Ed. 716 (1940) the Supreme Court stated that the Fifth and Fourteenth Amendments were intended to protect, at all times, people charged with or suspected of crimes from abuse by those holding positions of power and authority.

The proper remedy for official violence has historically depended on the circumstances; where it has been used to obtain evidence or jurisdiction, precluding such use has a prophylactic effect. But almost every consideration of application of exclusionary rules confronts anew the dilemma: shall a guilty defendant be permitted to go free to endanger the public; or shall steps be taken to deter official misconduct which if allowed to go unchecked poisons our society?

The objective, of course, is improved responses to this dilemma which will further each constitutional command and objective without unduly interfering with others.[12] To date relief in the form of preventing or overturning prosecutions has been limited to circumstances where official wrongdoing affected or involved abuse of the guilt-determining process, e.g. through use of improperly obtained evidence or abusively secured jurisdiction. See *United States v. Toscanino*, 500 F.2d 267, *rehearing denied* 504 F.2d 1380 (2d Cir.1974); *United States v. Lira*, 515 F.2d 68 (2d Cir.), *cert. denied* 423 U.S. 847, 96 S.Ct. 87, 46 L.Ed.2d 69 (1975).

Nevertheless, it has necessarily been recognized that situations may exist in which "the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction," *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d

---

**11.** It is not clear in what kind of "type" petitioner presented his brief; it may have only been 130 pages over the statutory limitation.

**12.** See Measures Relating to Organized Crime: Hearings before the Subcommittee on Criminal Laws & Procedures, Senate Judiciary Committee, 91st Cong., 1st Sess. 219–29 (1969).

366 (1973). The Court in *Russell* recognized the existence of such a situation in the limited context of entrapment, where the crime might not have occurred but for improper and creative activity on the part of government agents.

The question here is whether official misconduct unrelated to the commission or prosecution of crimes charged can bar prosecution for those crimes—and if so, whether this case falls within such a category. In evaluating this difficult issue, it is important to keep in mind that the purpose of such a remedy cannot be to relieve a criminal of punishment for the crime or crimes committed as compensation for wrongs done by representatives of the institutions of society.

Monetary compensation could have been sought under 42 USC § 1983 or state law—a remedy in fact suggested in the initial state court decision denying the relief now sought, *People v. Brown*, 125 Misc.2d 132, 479 N.Y.S.2d 113, 116 (Westchester Co. 1984), quoting ABA Standards of Criminal Justice which recommends application of "... (ii) criminal and tort liability for knowingly engaging in unlawful conduct." If for whatever reason petitioner failed to take advantage of the opportunity to file a damage action—even against unnamed officers[13]—that omission cannot now be cured by this court.

▮ Instead, the drastic remedy of release as a consequence of official misconduct not affecting the guilt-determining process could only be justified where it is found to be the only practicable means to protect the public and the Constitution from similar abuse in the future. See *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1961) (dealing with exclusionary rule concerning unconstitutionally obtained evidence).

The Supreme Court in *Hampton v. United States*, 425 U.S. 484, 490, 96 S.Ct. 1646, 1650, 48 L.Ed.2d 113 (1976) stated: "[i]f police engage in illegal activity ... beyond the scope of their duties the remedy lies not in freeing the equally culpable defendant, but in prosecuting the police under the applicable provisions of state or federal law."

Such prosecution may not be practicable given the lapse of time since the assaults involved, and failure of such prosecution to be instituted to date. Corrective measures are, however, possible including but not limited to:

(a) investigation looking to disciplinary action;

(b) training of police and corrections officers with the objective of preventing such conduct in the future; and

(c) establishment of procedures to provide protection against repetition of the events involved here, such as

(i) recordkeeping concerning prisoner injuries, and

(ii) inspector general or other private and neutral visits with prisoners by those not under the control of prison or police authorities, to ascertain whether or not they have been victims of official violence and to obtain prompt medical verification or treatment if indications exist.

The District Attorney has, to be sure, no direct authority to order corrective measures to reduce or eliminate the need for consideration of the drastic remedy of releasing a properly convicted defendant as a sanction against unrelated law enforcement abuses. That officer can however, raise the issue with those able to act and obtain a response to the court. Moreover, other incidents in varying jurisdictions over the period since the events affecting the present petitioner make it clear that the need for corrective measures cannot be confined to a single county.

▮ Thus the District Attorney is requested to furnish copies of this memorandum order to the Governor of the State and to the correction officials responsible for supervising the administration of the Rockland County Jail, with the request that they

---

**13.** See *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

**950**

report through the District Attorney within 90 days what investigative efforts have been, are being, or will be made and what remedial measures have been, are being, or will be taken as a result of the findings discussed above concerning beatings of petitioner in the Rockland County Jail. While this report doubtless must to some extent describe measures initiated prior to the date of this memorandum order as background, the focus of my request is not for an accounting of what has been done, but for a statement of what additional steps are or will be initiated.

The prophylactic purpose of the exclusionary rule was reaffirmed in *Stone v. Powell*, 428 U.S. 465, 486, 96 S.Ct. 3037, 3048, 49 L.Ed.2d 1067 (1976), holding that the deterrent effect of post-trial *habeas* relief for state court errors in considering Fourth Amendment objections to evidence offered at trial was insufficient to justify the interference with the truth-finding function of criminal trials. A similar question may have to be confronted in the present case. There was no way the state court could have provided a trial remedy for the beatings of the current petitioner. Moreover, the impact of any remedy would not have been for the benefit of petitioner or upon short-range police behavior, but upon the necessity for long-term state corrective action to avoid similar tragedies in the future. The response of the state, showing vigorous efforts to avoid such situations in the future, may make it unnecessary to confront in this case the difficult choice exemplified in another context by *Stone*.

I shall defer, pending the receipt of such response, definitive action with respect to assaults upon petitioner in the Rockland County Jail.

I do not find that any other argument submitted by petitioner supports his application for *habeas corpus*.

Upon receipt of the requested response, further consideration will be given to whether the Constitution, under all the circumstances, requires release of petitioner based on the abuse he received while in custody.

### Cruel and Unusual Punishment

In addition to his due process claims under the Fifth and Fourteenth Amendments, petitioner has, with respect to the assaults upon him in the Rockland County Jail, invoked the Eighth Amendment's prohibition against cruel and unusual punishment as a constitutional basis for his release. While cruel and unusual punishment was certainly involved in these assaults, the Eighth Amendment furnishes no basis for release beyond whatever grounds are afforded by due process. Petitioner does not, I note, allege any ongoing violence or threats of violence.

The Rockland County assaults against petitioner constituted unconstitutional cruel and unusual punishment prohibited by the Eighth Amendment. See *Wilkerson v. Utah*, 99 U.S. 130, 25 L.Ed. 345 (1879); *Weems v. United States*, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910). Failure to provide adequate medical care falls in the same category. *Estelle v. Gamble*, 429 U.S. 97, 102–03, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). Misconduct of the type involved here may form the basis for damage actions, or for injunctive relief if ongoing or threatened further violations were involved. However, petitioner cites no authority for releasing a prisoner because of prior cruel or unusual punishment or its consequences.

It would not be appropriate to grant Eighth Amendment relief in the form of release based on prior misconduct which is not now being continued or threatened, unless such relief were justified for the same reasons which would apply with respect to due process violations. Thus, the request that such a remedy be created raises the same considerations as those discussed above.

SO ORDERED.