THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v SAMUEL BROWN, Appellant.

Second Department, March 7, 1988

4

**APPEARANCES OF COUNSEL**

*Robert N. Isseks, P. C. (Alex Smith* of counsel), for appellant.

*Kenneth Gribetz, District Attorney (John S. Edwards, Sondra Holt* and *Janice Gittelman* of counsel), for respondent.

**OPINION OF THE COURT**

Per Curiam.

On October 20, 1981, a Brink's armored truck was robbed outside Nanuet National Bank at the Nanuet Mall in Rockland County. During the course of the robbery Joseph Trombino and Peter Paige, two of the Brink's guards, were shot, Paige fatally. The perpetrators fled in a red van and a light-colored Honda. The van was abandoned in a nearby parking lot, and its occupants left the lot in a U-Haul truck, heading toward Nyack. When the U-Haul attempted to enter the New York State Thruway it was stopped by several Nyack police officers. While the officers were speaking with one of the U-Haul's passengers, Katherine Boudin, the back of the truck

opened and as many as six armed men ran out and opened fire on the officers. Several witnesses identified the defendant as one of those men. When the shooting was over, two of the officers, Sergeant Edward O'Grady and Police Officer Waverly Brown, were dead. All of the perpetrators, with the exception of Boudin, managed to flee the scene, but after a high-speed chase, the Honda crashed and its occupants, Judith Clark, David Gilbert and the defendant, were arrested. Several of the perpetrators were subsequently identified as then current or former members of the "Weather Underground", a revolutionary group said to have engaged in violence in order to achieve political reform. It was alleged that this robbery was committed to finance the group's cause. By Rockland County indictment No. 285/81 filed November 19, 1981, the defendant, Boudin, Clark and Gilbert were charged, under the theory of acting in concert, with, *inter alia,* three counts of felony murder and six counts of robbery in the first degree.

Initially, there was some indecision over who would represent the defendant. During the months following his indictment the defendant was approached by several attorneys who were said to be sympathetic to the "Weather Underground" movement. In March 1982 Evelyn Williams, who the defendant alleges was also at one time associated with that movement, was substituted as counsel for the defendant. However, in December 1982 after a *Wade* hearing was conducted, Ms. Williams moved for permission to be relieved. According to Ms. Williams, she had just learned that the defendant had voluntarily provided information to Federal law enforcement officials without her knowledge, and as a consequence she did not believe she could continue to represent him. Though her motion was initially denied, in June 1983 Ms. Williams was relieved, and Robert N. Isseks was ultimately appointed to represent the defendant.

Throughout the proceedings the defendants expressed concern over their ability to receive a fair trial in light, *inter alia,* of their reputations and the publicity surrounding these crimes. In 1982 the defendant and Boudin moved in this court to change venue from Rockland County. It was alleged that the prejudicial character and intensity of the local publicity, along with the emotionally charged atmosphere the crimes created in this small community, made it impossible for the defendants to receive a fair trial in Rockland County. This

court denied that motion as premature, noting that it was "not convinced that the publicity surrounding this case is of so localized and incessant a nature, or that the atmosphere in Rockland County has become so emotionally charged, as to preclude the selection of a fair and impartial jury" *(People v Boudin,* 87 AD2d 133, 135). Several months later, and prior to the commencement of jury selection in Rockland County, the defendants renewed their motion for a change of venue, based upon additional facts presented in support of the renewed motion. This court granted the renewed motion and venue was changed to Orange County *(People v Boudin,* 90 AD2d 253). On the eve of trial in Orange County, Boudin and the defendant made a pre-voir dire motion to change venue to a large, metropolitan community, again based on intense local publicity and communitywide prejudice. This court denied the motion, with leave to renew after completion of the voir dire, and noted that the publicity in Orange County was not of the same intensity as that in Rockland County, and the evidence presented did not establish community pressure comparable to that found to exist in Rockland County *(People v Boudin,* 95 AD2d 463). The motion was renewed after the initial screening of potential veniremen. Based upon the totality of the circumstances, the nature and homogeneity of the community combined with the percentage of veniremen having expressed a firm opinion which they could not set aside, this court determined that "the stringent standards necessary for a change of venue have now been met" *(People v Boudin,* 97 AD2d 84, 85).[1] The case was removed to Westchester County, this court noting that the defendants conceded that Westchester was an appropriate site for the trial, "agreeing that its population is of sufficient size and heterogeneity to ensure the selection of a fair and impartial jury" *(People v Boudin, supra,* at 86-87).

During the course of jury selection in Westchester County, the defense counsel questioned the defendant's physical and mental competency. The defendant had been experiencing pain intermittently, and apparently was very apprehensive about his continued imprisonment in the Rockland County

1. In July 1983 by order of the Supreme Court, Orange County (Ritter, J.), the defendant's case had been severed from that of his codefendants because he had just been assigned new counsel. In addition, by separate order of the Supreme Court, Orange County (Ritter, J.), Boudin was granted a severance and her case was joined with that of the defendant.

Jail.[2] In March of 1984 the court ordered an examination pursuant to CPL article 730. After conducting an initial examination, the two psychiatrists appointed under the authority of CPL 730.20, Drs. Leslie Brooks and Edward Allan, agreed that the defendant should remain at the Westchester County Jail for a three-week evaluation. After speaking with Dr. Allan further, the trial court concluded that jury selection could continue during this evaluation period. In April 1984 a competency hearing was held, at the conclusion of which the trial court determined that the defendant was not an incapacitated person as that term is used in CPL 730.10 (1), and that the pain the defendant was experiencing did not so incapacitate him as to render him unable to go forward.

Prior to the conclusion of the competency hearing, Boudin entered a plea of guilty to the crime of murder in the second degree and robbery in the first degree in satisfaction of the indictment. She was sentenced to concurrent terms of 20 years to life imprisonment for murder and 12½ to 25 years' imprisonment for robbery.

Jury selection resumed, and all the prospective jurors previously examined were called back to be questioned regarding their knowledge of Boudin's guilty plea and its effect upon their ability to render a fair and impartial verdict. The defendant's motion for a mistrial was denied. After jury selection was completed, the defendant made his final motion for a change of venue, based upon pretrial publicity with particular emphasis on the publicity surrounding Boudin's plea and sentence and the heightened security measures in the courthouse. This court denied that motion by order dated May 24, 1984.

At the conclusion of the trial, the jury found the defendant guilty of three counts of murder in the second degree and four counts of robbery in the first degree.

Several days later, a posttrial hearing was held on the issue of whether the indictment should be dismissed because (1) the defendant was a victim of brutality and (2) the attorneys who represented the defendant prior to the appointment of Mr. Isseks had allegedly failed to provide him with meaningful representation.[3] At the hearing, the defendant testified that

---

2. As will be discussed, the defendant sustained a broken neck during his initial incarceration at the Rockland County Jail, apparently in the course of an altercation with several correction officers.

3. This hearing was ordered in November of 1983 before the trial, in

for the first five days of his imprisonment he was beaten by several correction officers 3 to 6 times a day. As a result of these beatings his neck was seriously injured and he required spinal surgery in January of 1982. With regard to the denial of effective assistance of counsel the defendant testified that while he was being held at a Federal correctional facility in Otisville[4] he was approached by Federal agents. He was interviewed repeatedly and wrote down whatever he was told. Though he was represented by counsel, his counsel was not consulted by the agents. In fact, it was as a result of these interviews that his attorney Ms. Williams ultimately sought to be relieved as counsel.

The testimony given by Kenneth Maxwell, Special Agent with the Federal Bureau of Investigation (hereinafter FBI), at the pretrial voluntariness hearing[5] was placed into evidence by the prosecution at this posttrial hearing. Special Agent Maxwell testified that he and another FBI agent met with the defendant at the defendant's request, and obtained statements from the defendant to this effect. Each time they met, the defendant signed a waiver of counsel form and indicated that he did not want his attorney present.

The trial court found, based upon a comparison of the X rays taken when the defendant was arrested and those taken prior to his operation, that the defendant sustained a broken neck while in custody and thus was a victim of brutality during his detention. In addition, the court found that the defendant's right to counsel had been violated. However, the court denied the defendant's motion to dismiss the indictment, because the defendant failed to establish any causal link between this official misconduct and the evidence offered to

response to the defendant's motion to dismiss the indictment on those grounds.

4. Shortly after his arrest the defendant was transferred to the Federal facility at the request of the Rockland County District Attorney, on the theory that a facility more secure than the Rockland County Jail was needed to house the defendant.

5. Prior to trial a hearing was held to determine the voluntariness of the statements made by the defendant to Federal law enforcement officials in November and December 1981 and January 1982. These statements were taken in violation of the defendant's right to counsel under the New York State Constitution and therefore could not be used as part of the People's direct case. However, the prosecution sought to use them to impeach the defendant in the event he chose to testify at trial. After Special Agent Maxwell testified that he had assured the defendant that anything he said would not be used against him, the prosecutor agreed that he would not use the statements against the defendant, and the statements were suppressed.

convict him (see, *People v Brown,* 125 Misc 2d 132). The defendant was subsequently sentenced to three consecutive terms of 25 years to life imprisonment on each murder count, to run concurrently with four concurrent terms of 12½ to 25 years' imprisonment on each robbery conviction.

■ On appeal, the defendant initially contends that the indictment against him should have been dismissed because his due process rights were violated when he was brutalized by prison officials after his arrest and when governmental officials intentionally interfered with his right to counsel. It has been held that due process requires the dismissal of an indictment based upon legally sufficient evidence where the misconduct of the law enforcement officials involved was particularly egregious (see, *People v Isaacson,* 44 NY2d 511, *rearg denied* 45 NY2d 776; *People v Archer,* 68 AD2d 441, *affd* 49 NY2d 978, *cert denied* 449 US 839; *People v Rao,* 73 AD2d 88). However, in each case in which the indictment was dismissed, the misconduct implicated the integrity of the judicial process, be it by leading to the improper procurement of evidence (see, e.g., *Rochin v California,* 342 US 165), or intentionally and improperly luring the defendant into the court's jurisdiction (see, e.g., *People v Isaacson, supra; United States v Toscanino,* 500 F2d 267, *reh denied* 504 F2d 1380), or creating or actively facilitating the crime for which the defendant was ultimately convicted (see, e.g., *United States v Russell,* 411 US 423; *People v Archer, supra; People v Rao, supra).* In contrast, the conduct objected to at bar did not occur until after the commission of the crime and the defendant's arrest therefor, and no evidence was obtained as a result thereof. Indeed, the misconduct appears to have been motivated not by a desire to obtain evidence from the defendant, but by a desire for retribution. Thus, although the conduct of the officers involved was reprehensible, it did not infect the judicial proceedings to such a degree as to result in the denial of the defendant's right to due process of law, requiring dismissal of the indictment against him.

■ Similarly without merit is the defendant's contention that he was denied due process as the result of governmental interference with his right to counsel. Firstly, the record simply does not support the defendant's assertion that State prosecutors were acting in conjunction with the Federal agents who took statements from him. Indeed, it seems as though the Federal agents were deliberately avoiding any contact with State agents, so as not to interfere with the State

prosecution. Secondly, the testimony of Special Agent Maxwell, which the trial court found to be credible, established that the meetings were held at the defendant's request, that the defendant knowingly and intentionally relinquished his right to counsel, and that there was no attempt on the part of the Federal agents to deliberately undermine the defendant's faith in the ability of his attorney *(cf., People v Mason,* 97 Misc 2d 706; *Commonwealth v Manning,* 373 Mass 438, 367 NE2d 635). In short, the record simply does not contain any evidence of the type of intentional interference with the defendant's right to counsel that would warrant the dismissal of the indictment based upon a due process violation *(see, People v Pobliner,* 32 NY2d 356, *cert denied* 416 US 905).

█ In a related argument, the defendant contends that the conflicts of interest between himself and the attorneys representing him prior to Mr. Isseks' appointment resulted in a denial of his right to the effective assistance of counsel, and that those attorneys did not provide him with meaningful representation. "It is well established that the constitutional right to counsel is a right to the effective assistance of counsel, meaning the reasonably competent assistance of an attorney acting as a diligent, conscientious advocate with undivided loyalty throughout the critical stages of a criminal proceeding *(see, Cuyler v Sullivan,* 446 US 335; *Holloway v Arkansas,* 435 US 475; *United States v Wade,* 388 US 218; *Glasser v United States,* 315 US 60)" *(People v Winkler,* 128 AD2d 153, 159, *lv granted* 70 NY2d 659). Thus, it has been held that the right to the effective assistance of counsel may be impaired where the defense counsel represents interests which may be in conflict with those of the defendant *(see, People v McDonald,* 68 NY2d 1, *rearg dismissed* 69 NY2d 724; *People v Gomberg,* 38 NY2d 307). The defendant alleges that the attorneys that represented him prior to Mr. Isseks were more concerned with the interests of the "Movement" than with the interests of the defendant. Whether or not these attorneys actually were "Movement" attorneys, the defendant has totally failed to establish the existence of a significant possibility of a conflict of interest which bears a substantial relationship to the conduct of the defense *(see, People v McDonald, supra; People v Lombardo,* 61 NY2d 97; *People v Macerola,* 47 NY2d 257). Unlike some of their cocounsel, Mr. Isseks' predecessors vigorously represented the defendant's interests and conducted his defense appropriately. Though Ms. Williams' request for permission to withdraw as counsel upon learning that the defen-

dant provided information to Federal agents may be an indication that she was interested in the success of the "Movement", there has been no showing that this interest created a conflict which bore a relationship to the defense. The "evidence, the law and the circumstances of [this] case, viewed together and as of the time of representation, reveal that meaningful representation was provided" the defendant prior to the assignment of Mr. Isseks (see, People v Satterfield, 66 NY2d 796, 798-799). Thus, the defendant's constitutional right to the effective assistance of counsel was not violated.

■ The defendant also raises several issues with regard to his mental and physical competency to stand trial. Though most of these issues do not warrant discussion, we note that the trial court did consider the defendant's contention that the chronic, intermittent pain he was allegedly experiencing caused him to be unable to assist in his defense, and dealt with this issue satisfactorily by informing the defendant that if there came a time when he considered himself unable to continue, a recess would be taken. In addition, the People met their burden of establishing that the defendant was not an incapacitated person as that term is defined in CPL 730.10 (1), and the trial court's determination to that effect was neither arbitrary nor capricious. Finally, the court properly authorized the retention of expert medical assistance by the defendant when the defendant established that such assistance was reasonably necessary (see, County Law § 722-c; United States v Durant, 545 F2d 823).

■ The defendant also contends that the fact that the case was tried in Westchester County, as well as numerous errors during jury selection, served to deprive him of his right to a fair trial by an impartial jury. This court previously denied the defendant's motion for a change of venue from Westchester County, and thus, the determination that the defendant failed to demonstrate a reasonable cause to believe that a fair and impartial trial could not be had in that county (see, CPL 230.20 [2]) is the law of the case. As the defendant has not raised anything material on appeal that he did not raise in support of his motion for a change of venue, we decline to reconsider our previous determination. Additionally, we note that contrary to the defendant's contention, the order in which the introductory questions were asked of the prospective jurors by the trial court did not make it impossible for the defendant to determine how many prospective jurors

actually did have preconceived opinions which they considered themselves unable to put aside.

■ The court did not err in denying the motion for a mistrial made by the defendant on the ground that the Boudin guilty plea rendered it impossible for him to receive a fair trial. Though there was extensive media coverage of the guilty plea throughout New York State, the prospective jurors were all questioned extensively about the effect the guilty plea might have on their ability to be impartial, and those who indicated that it might affect their judgment were promptly excused. In addition, cautionary instructions were given by the court regarding the Boudin guilty plea. Based upon the foregoing, the denial of the motion for a mistrial does not constitute an abuse of discretion *(see, People v Testa,* 61 NY2d 1008; *People v Robinson,* 114 AD2d 120, *revd on other grounds* 68 NY2d 541; *People v Costello,* 104 AD2d 947).

■ Nor did the court err in denying the motion for a mistrial on the basis that the heightened security measures employed at the Westchester County Courthouse stripped the defendant of the presumption of innocence and deprived him of his right to a fair trial. As the Supreme Court recently held, the employment of security personnel in the courtroom is not the sort of inherently prejudicial practice that should be permitted only where justified by an essential State interest specific to each trial *(Holbrook v Flynn,* 475 US 560). "While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence" *(Holbrook v Flynn, supra,* at 569). Indeed, at bar the prospective jurors were questioned at length regarding the increased security measures, and the majority of the jurors who associated the security with this case indicated that they did not believe that the security was increased because the defendant was particularly dangerous. Even assuming that the heightened security measures needed some justification, the record amply demonstrates the necessity for such measures.

With regard to jury selection, a review of the questioning of each prospective juror objected to by the defendant on appeal leads us to conclude that the court properly denied the defen-

dant's challenges for cause on the basis that those jurors had a state of mind likely to preclude them from rendering an impartial verdict based upon the evidence adduced at trial *(see,* CPL 270.20 [1] [b]; *People v Torpey,* 63 NY2d 361, *rearg denied* 64 NY2d 885; *People v Sims,* 110 AD2d 214, *lv denied* 67 NY2d 657).

■ The defendant also takes issue with the court's determination that the fact that a prospective juror was related to someone in law enforcement did not constitute a per se disqualification under CPL 270.20 (1) (c) *(see, People v Boudin,* 124 Misc 2d 967, 968). That paragraph, in pertinent part, provides that a challenge for cause may be made on the ground that the juror bears some relationship to the defendant, the victim, a prospective witness or one of the attorneys involved, "of such nature that it is likely to preclude him from rendering an impartial verdict". In such situations bias is implied as a matter of law from the existence of the relationship *(see, People v Branch,* 46 NY2d 645). Though the similarity of occupation between a member of a juror's family and the victim has been held to constitute the type of relationship contemplated by CPL 270.20 (1) (c) *(see, People v Culhane,* 33 NY2d 90, 104, n 2; *People v Harris,* 84 AD2d 63, *affd* 57 NY2d 335, *cert denied* 460 US 1047; *see also, Sims v United States,* 405 F2d 1381, 1384, n 5), such a similarity does not warrant an automatic implication of bias *(see, People v Smith,* 110 AD2d 669, *revd on other grounds* 68 NY2d 737, *cert denied —* US —, 107 S Ct 444; *People v Nelson,* 92 AD2d 1036). The court must look to the circumstances of each case to determine whether the relationship is one which is likely to preclude the juror from rendering an impartial verdict. Here the court did just that, and excused those jurors which it found would likely be precluded from rendering an impartial verdict based upon their relationship to law enforcement officials. This approach was proper and did not serve to deny the defendant a fair trial.

■ As to the defendant's allegation that the court erred in denying his motion for a mistrial made during voir dire, based upon the allegation that many of the prospective jurors disobeyed the court's instructions and read articles or watched or listened to news reports about this case, we note that the court examined the circumstances surrounding the allegations of juror misconduct and determined the nature of the material placed before the jurors and the likelihood that prejudice would be engendered *(see, People v Testa,* 61 NY2d 1008,

*supra).* Based upon the results of this inquiry the court's denial of the motion for a mistrial did not constitute an abuse of discretion.

Also without merit is the defendant's contention that the court erred in permitting media coverage of the competency hearing conducted during the voir dire, as the defendant failed to demonstrate a strong likelihood that evidence relevant and admissible at the hearing would prejudice his trial if it were disclosed to potential jurors *(see, Matter of Westchester Rockland Newspapers v Leggett,* 48 NY2d 430). Moreover, the court did not err in refusing to grant the defendant's request for additional peremptory challenges *(see,* CPL 270.25; *People v Gantz,* 104 AD2d 692; *People v Fox,* 99 Misc 2d 1061; *see also, People v McCray,* 57 NY2d 542, 546, n 2, *cert denied* 461 US 961).

With regard to the actual conduct of the trial, the defendant first contends that he was entitled to a mistrial when the prosecutor elicited testimony regarding a lineup identification which had been suppressed after the *Wade* hearing (Stolarik, J.). This identification was made by Lorraine Ann Priest at the State Police barracks in Monroe on April 15, 1982. The testimony regarding this lineup was suppressed because after Priest chose the defendant's picture from a photographic array in 1981, she was told that she had chosen one of the suspects in the case. During the course of his direct examination of Priest at the trial, the prosecutor asked Priest if she had attended a lineup on April 15, 1982, in Monroe at the State Police barracks, and she replied affirmatively. The court immediately called both counsel to the Bench, and after an off-the-record discussion the prosecutor withdrew the question and indicated he had no more questions, and the jury was excused for lunch. The defendant then moved for a mistrial based upon the prosecutor's question. The court noted that the prosecutor appeared genuinely surprised when he was informed that Priest's lineup identification testimony had been suppressed, and that defense counsel had previously indicated that he was going to cross-examine Priest regarding the two prior photographic arrays she viewed. In view of these circumstances, and since the questioning on the issue did not go too far, the court denied the defendant's motion for a mistrial. The court's offer of a curative instruction was refused. We find the trial court's actions in this regard to have been, in all respects, proper.

Additionally the defendant contends that the trial court

improperly denied his application to retain the services of Dr. Robert Buckhout, an expert in the field of eyewitness identification, at public expense *(see, People v Brown,* 124 Misc 2d 938). In general, the admissibility of expert testimony is addressed to the sound discretion of the trial court *(People v Cronin,* 60 NY2d 430; *People v Mitchell,* 129 AD2d 589, *lv denied* 70 NY2d 715). Under the circumstances of this case it cannot be said that the trial court abused that discretion when it held that Dr. Buckhout's testimony on the defendant's behalf would be inadmissible *(see, People v Mitchell, supra).* Thus, the court did not err in denying the defendant's request to retain Dr. Buckhout's services at public expense *(see,* County Law § 722-c).

The court did err, however, in permitting the prosecution to offer medical testimony regarding the efforts used in attempting to resuscitate Sergeant O'Grady and Police Officer Brown. Unlike the medical testimony of the doctor who attended to Joseph Trombino, which was used to establish serious physical injury *(see,* Penal Law § 120.10), the testimony of the unsuccessful efforts to resuscitate O'Grady and Brown had no probative value *(see, People v Pobliner,* 32 NY2d 356, *cert denied* 416 US 905, *supra).* However, due to the very technical nature of the limited testimony given on this subject, the potential prejudice to the defendant was minimal and reversal is not required on this basis.

The defendant also contends that the trial court denied him a fair trial and the effective assistance of counsel when he placed a time limitation on the defense counsel's summation. The closing argument is a basic element of the defense in a criminal trial and the right of defense counsel to make an effective closing argument is impaired when counsel is unjustifiably limited or repeatedly interrupted during summation *(see, People v Reina,* 94 AD2d 727). However, the trial court must be given great latitude in controlling the duration and limiting the scope of summations, and thus may limit counsel to a reasonable time and may terminate an argument when continuation would be repetitive and redundant *(see, Herring v New York,* 422 US 853, 862; *People v Demerritt,* 113 AD2d 898, *lv denied* 66 NY2d 918). At bar the court was justified in limiting the length of defense counsel's summation, as most of the evidence adduced at trial was uncontested, and defense counsel was warned several times that he should focus on the issues presented and that the failure to do so would cause the court to place a time limitation on him. Defense counsel

refused to heed the court's warnings and budget his time efficiently, and a similar time limitation was placed upon the prosecutor.

Finally with regard to the actual trial, we find the defendant's contention that the jury verdict was not supported by the evidence to be without merit. Viewing the evidence in the light most favorable to the prosecution, we find it legally sufficient to support the defendant's conviction. Moreover, upon the exercise of our factual review power, we are satisfied that the verdict was not against the weight of the evidence (see, CPL 470.15 [5]).

The defendant raises the following three issues regarding the sentence he received: (1) the imposition of consecutive sentences was improper, (2) the sentence he received was violative of the Equal Protection Clause, and (3) his sentence should be reduced in the interests of justice.

■ Contrary to the defendant's assertion, the imposition of consecutive terms of imprisonment for the three felony murder convictions was not illegal. Each act of murder was separate and distinct, and "neither was a material element of the other[s]" (see, People v Brathwaite, 63 NY2d 839, 843; People v Robbins, 118 AD2d 820, lv denied 67 NY2d 949; Penal Law § 70.25 [2]). Secondly, the imposition of three consecutive terms of 25 years to life imprisonment does not constitute a denial of the defendant's right to equal protection of the laws based on the fact that the codefendant Boudin received only one term of 20 years to life imprisonment upon her plea of guilty to one count of murder in the second degree. The constitutional right to equal protection of the laws requires only that " 'no different or higher punishment should be imposed upon one than such as is prescribed to all for like offenses' " (People v Jones, 39 NY2d 694, 697, quoting from Barbier v Connolly, 113 US 27, 31); it does not require that all the participants in a crime be sentenced equally (see, People v Danny G., 61 NY2d 169; People v Semkus, 122 AD2d 287, lv denied 68 NY2d 1004). The relative participation of the defendant and Boudin in the crimes charged, as well as their relative criminal histories, provides an ample basis for sentencing them differently. Further, the interests of justice do not warrant a reduction in the sentence imposed upon the defendant.

■ We find the defendant's remaining contentions, including the assertion that he was denied his right to a meaningful

appeal because the length of his brief was limited to 200 pages, and his time for oral argument was limited, to be without merit. The defendant was permitted to serve a brief almost three times as long as the 70-page maximum ordinarily allowed by our rules *(see,* 22 NYCRR 670.17 [g] [2]) and was permitted 45 minutes of oral argument, 50% more time than the maximum ordinarily authorized *(see,* 22 NYCRR 670.22 [b]).

Accordingly, the judgment appealed from should be affirmed.

BRACKEN, J. P., WEINSTEIN, KOOPER and SULLIVAN, JJ., concur.

Ordered that the judgment is affirmed.