**Samuel BROWN, Petitioner–Appellant,**

v.

**John DOE, Warden, Respondent–Appellee.**

**No. 1574, Docket 93–2149.**

United States Court of Appeals, Second Circuit.

Argued May 17, 1993.

Decided Aug. 19, 1993.

Robert N. Isseks, Goshen, NY (Alex Smith, Middletown, NY, of counsel), for petitioner-appellant.

John S. Edwards, New City, NY, Asst. Dist. Atty. (Kenneth Gribetz, Rockland County Dist. Atty., Deborah Wolikow Loewenberg, Sondra S. Holt, Asst. Dist. Attys., of counsel), for respondent-appellee.

Before: WINTER and JACOBS, Circuit Judges, and MUKASEY, District Judge.*

JACOBS, Circuit Judge:

Petitioner Samuel Brown appeals from a judgment of the United States District Court for the Southern District of New York (Broderick, *J.*) denying a petition for a writ of habeas corpus. A New York Supreme Court jury convicted Brown of three counts of felony murder, four counts of robbery in the first degree and other related lesser felonies for his participation in the robbery of a Brink's armored truck in October 1981. Brown is now serving a sentence of 75 years to life. The case received widespread and sensational publicity, primarily because the fleeing robbers shot and killed two police officers and because the robbery allegedly was committed on behalf of a revolutionary group known as the Weather Underground.

Brown argues on appeal chiefly that his due process rights were violated because he was repeatedly and brutally beaten after his arrest, and suffered a broken neck which he claims remained untreated for over two months. Brown offers additional grounds for relief, including claims of ineffective assistance of counsel, incompetence to stand trial, prejudice arising from extraordinary security measures used at trial, and judicial bias. Because none of these arguments affects the validity of Brown's conviction, we affirm.

## BACKGROUND

On October 20, 1981, a Brink's armored truck was robbed while stopped at the Nanuet Mall in Rockland County, New York. During the course of the robbery, the robbers shot two of the Brink's guards, killing one. The robbers fled in a red van and a light-colored Honda. The van was abandoned in a nearby parking lot, and its passengers left the lot in a U–Haul truck, heading toward the Village of Nyack. The U–Haul was stopped by several Nyack police officers at an entrance to the New York State Thruway. While the officers were speaking with one of the U–Haul's passengers, Kathy Boudin, the back of the truck opened and several gunmen emerged firing automatic weapons at the police officers. Two police officers were killed and a third was wounded. The surviving officer and three other witnesses identified Brown as one of the gunmen.

All of the robbers, with the exception of Boudin, managed to escape the scene. Brown jumped into the rear seat of the waiting Honda, which then led police on a high speed chase. The Honda, unable to negotiate a turn, crashed into a concrete barrier. Three persons were inside, including Brown. Brown was found wearing several layers of clothing, including three pairs of pants, and carrying in his sock a nine millimeter ammunition clip with 14 live rounds. Recovered from the Honda were a pistol, ammunition,

---

* Honorable Michael B. Mukasey, United States District Judge for the Southern District of New York, sitting by designation.

money bags, a ski mask, a bullet proof vest, various articles of clothing, and more than $800,000.

Brown was removed from the Honda semiconscious and taken to Nyack Hospital where he was treated for injuries apparently caused by the accident. Although medical records indicate that Brown was given a cervical collar to wear, they also indicate that his neck was not broken as of October 20, 1981. Brown was discharged from Nyack Hospital the next day and taken to the Rockland County Jail. Brown claims that over the next several days guards entered his cell and severely and repeatedly beat him, causing him to sustain a broken neck. Brown's attorney asked to have him relocated to a hospital outside Rockland County, whereupon he was moved to the federal correctional facility in Otisville, New York.

Brown claims he was deprived of adequate medical attention for at least two months after his neck was broken. Sometime in December 1981 his injury was diagnosed, and in January 1982 he received corrective surgery. At a pretrial hearing on a motion to dismiss the indictment, the trial court found that Brown's injuries "could only have occurred while he was in custody." *People v. Brown*, 125 Misc.2d 132, 134, 479 N.Y.S.2d 113, 115 (N.Y.Co.Ct.1984). The trial court further found that Brown established "that he was, in fact, a victim of brutality during his detention at the Rockland County Jail." *Id.*

During the ensuing investigation into the robbery, several of the robbers were identified as then current or former members of the Weather Underground, a violent revolutionary group. It was alleged that this robbery was committed to finance the group's objectives.

Brown was represented by a series of attorneys in this case, the first four of whom he describes as having "radical aspirations." His first attorney was Susan Tipograph, who also represented one of Brown's co-defendants. Ms. Tipograph was later relieved as Brown's counsel because of the evident likelihood of a conflict of interest. Brown then agreed to be represented successively by Alton Maddox, Chokwe Lumumba and Evelyn Williams. Ms. Williams was substituted as counsel in March 1982 and continued to represent Brown through June 1983, although during this time Brown consulted briefly with at least two other lawyers. According to Brown, his four successive "revolutionary lawyers" pursued a confrontational defense strategy jointly with counsel for his co-defendants in furtherance of "radical political beliefs," a strategy that "made the idea of a plea [bargain] for their client deeply repugnant to them."

Although his counsel opposed any cooperation with law enforcement authorities, Brown initiated a series of ten interviews with FBI agents in November 1981, keeping those encounters secret from his revolutionary counsel. Ms. Williams learned of the interviews in December 1982 and asked for permission to be relieved. The trial court initially denied her motion, and then granted it in June 1983. Shortly thereafter, Robert N. Isseks, Brown's fifth lawyer (or possibly seventh) was appointed to represent Brown, and represents him on this habeas petition.

A pretrial hearing, conducted to determine the voluntariness of the statements made by Brown to the FBI, established that, at each interview, Brown waived his right to counsel in writing, and that Brown chose to exclude his revolutionary counsel from the interviews because he feared that his life would be endangered if the "Movement" became aware of his cooperation with the FBI. The state trial court nevertheless suppressed Brown's statements to the FBI because the court found that Brown's right to counsel under the New York State Constitution had been violated. No evidence resulting from the FBI interviews was used to convict him.

For trial purposes, Brown's case had been severed from that of all his co-defendants except Boudin. Throughout the proceedings, he and Boudin protested that they were unable to receive a fair trial because of their alleged association with a revolutionary movement and the tremendous publicity surrounding these crimes. Their successive motions for a change of venue resulted in the proceedings being moved first from Rockland County to Orange County, and later to West-

chester County, where the case came to trial in March 1984.

During the course of jury selection, defense counsel questioned Brown's physical and mental capacity to stand trial. Brown said he was experiencing pain and was apprehensive about being imprisoned in the Rockland County Jail during trial. A court-ordered examination of Brown in March 1984 resulted in his three-week detention at the Westchester County Jail for further evaluation while jury selection continued. In April 1984, the court held a competence hearing and determined that Brown was capable of proceeding with the trial.

While the competence proceedings were ongoing, co-defendant Boudin pleaded guilty to second degree murder and first degree robbery. Brown moved for a mistrial. The trial court re-examined the prospective jurors as to their knowledge of the guilty plea and its effect on their ability to render a fair and impartial verdict, and denied the motion. After jury selection, Brown made another motion for a change of venue, based upon pretrial publicity, the publicity surrounding Boudin's plea and sentence, and the heightened security measures evident at the courthouse. The motion was denied and the trial proceeded to a guilty verdict on June 14, 1984.

Shortly thereafter, the trial court conducted a hearing on Brown's motion to dismiss the indictment on the grounds that the police brutality violated due process and that he was denied meaningful representation by counsel. The court found that Brown's constitutional rights had been violated by the beating, but declined to dismiss the indictment because Brown failed to establish "some causal linkage between the illegality and the evidence offered to secure his conviction." *People v. Brown*, 125 Misc.2d at 134, 479 N.Y.S.2d at 115.

All of the grounds offered for habeas relief were presented by Brown in his direct appeal and in his post-conviction applications, and all were uniformly rejected. Having exhausted his state remedies, Brown petitioned the district court for a writ of habeas corpus.

In a decision reported at 803 F.Supp. 932 (S.D.N.Y.1992), the district court rejected all grounds for habeas relief with the exception of the claim of police brutality, as to which the court deferred decision. With respect to the brutality claim, the district court agreed with the state courts that no causal link had been established between the official misconduct and the evidence offered to convict Brown. *Id.* at 948. The district court concluded, however, that "the drastic remedy of release as a consequence of official misconduct not affecting the guilt-determining process" might be justified where it is the only practicable means to prevent similar abuse in the future. *Id.* at 949. The district court then reviewed alternative preventive measures, including criminal or tort liability for the misconduct; investigation and disciplinary action; improved police training; and improved corrections procedures and record-keeping. The district court ordered the District Attorney of Rockland County to request a report from the Governor of New York and the administrator of the Rockland County Jail concerning investigative and remedial measures being taken. Upon receipt of the requested information and upon learning that Brown had brought two civil rights actions under 42 U.S.C. § 1983 based on the beating incident, the district court issued a supplemental decision, reported at 811 F.Supp. 156 (S.D.N.Y.1993), denying habeas relief on the brutality ground because Brown was not without remedy for the official misconduct. A certificate of probable cause for an appeal was issued pursuant to 28 U.S.C. § 2253.

## DISCUSSION

Brown does not dispute on this appeal that the evidence against him was overwhelming. Rather, he alleges that his rights to due process and a fair trial were violated by law enforcement officials, defense counsel and the trial judge, and by certain procedural rulings relating to the trial. A number of these issues are substantial, and they are presented to us with forceful and skilled advocacy. Nevertheless, we conclude ultimately that none of Brown's claims has merit.

## I. Due Process and Police Brutality

■ The state court proceedings established that Brown was brutally beaten by law enforcement officials during his detention at the Rockland County Jail. However, the state court also found that there was no causal link between the constitutional violation and the evidence offered to convict Brown. The official misconduct therefore did not affect the reliability of the trial verdict, and Brown does not claim that it does. Rather, Brown alleges that the governmental conduct here was so outrageous and so offensive to due process of law that it bars his prosecution and requires dismissal of the indictment. The district court satisfied itself—and us—that the wrong committed by the police has its own remedies. It is unnecessary to remedy that wrong by absolving Brown of his own crime, and there is no interest of justice served by a result in which the community suffers two unpunished wrongs. While the various constitutional protections against official violence may be impaired unless relief is available to the victim, that relief must find its source in the Constitution or in statutory or common law, and not in our recoil from police misconduct.

Brown properly invokes the Due Process Clause as the source of constitutional protection against the violence inflicted on him. "[T]he Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Graham v. Connor,* 490 U.S. 386, 395 n. 10, 109 S.Ct. 1865, 1871 n. 10, 104 L.Ed.2d 443 (1989) (citing *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 1871–72, 60 L.Ed.2d 447 (1979)).[1] Brown contends that the only way to rectify the violation of his due process rights is to bar his prosecution. Brown tries to justify such a drastic remedy with a patchwork of Supreme Court *dicta.*

Brown primarily relies on *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), which concerned the defense of entrapment and warned that official participation in criminal activity as part of law enforcement efforts may be so shocking as to bar prosecution even though the official misconduct does not necessarily negate the defendant's predisposition to commit the crime. In this limited context, the Court observed, "we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Id.* at 431–32, 93 S.Ct. at 1643. This *dictum* in *Russell* was brought into question by *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976). *Hampton,* like *Russell,* dealt with a defendant unable to establish an entrapment defense, who argued that police participation in the charged crime violated his due process rights and required dismissal. Rejecting this argument, the Supreme Court observed: "If the police engage in illegal activity in concert with a defendant beyond the scope of their duties the remedy lies, not in freeing the equally culpable defendant, but in prosecuting the police under applicable provisions of state or federal law." 425 U.S. at 490, 96 S.Ct. at 1650 (citations omitted).

Brown also relies on *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), in which the Supreme Court overturned a drug dealer's conviction obtained with the aid of evidence the police seized by forcibly pumping his stomach to retrieve two morphine capsules he had swallowed. The Supreme Court held that, where evidence is obtained by police behavior which "shocks the conscience," a conviction based on that evidence violates due process. *Id.* at 172, 72 S.Ct. at 210. Brown would read *Rochin* to

---

**1.** In a criminal proceeding, the source of the constitutional right against physically abusive government conduct depends on the context. "Where ... the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment." *Graham,* 490 U.S. at 394, 109 S.Ct. at 1870–71. The Due Process Clause gov-

erns claims arising in the pre-trial detention context. *Id.* at 395 n. 10, 109 S.Ct. at 1871 n. 10. "After conviction, the Eighth Amendment 'serves as the primary source of substantive protection ... in cases ... where the deliberate use of force is challenged as excessive and unjustified.'" *Id.* (quoting *Whitley v. Albers,* 475 U.S. 312, 327, 106 S.Ct. 1078, 1088, 89 L.Ed.2d 251 (1986)).

bar prosecution whenever the government has engaged in conduct that "shocks the conscience." However, viewed in light of the Supreme Court's subsequent exclusionary rule decisions, *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), and *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), *Rochin* stands at most for the proposition that a prosecution may effectively be foreclosed by exclusion of evidence tainted by a Fourth Amendment violation. *See United States v. Crews,* 445 U.S. 463, 474 n. 20, 100 S.Ct. 1244, 1251 n. 20, 63 L.Ed.2d 537 (1980).

We find *Crews* persuasive, if not controlling, in the present case. In *Crews,* the defendant had been arrested initially without probable cause, photographed and released. Based on the victim's identification of his photograph, he was arrested again. The trial court suppressed the photographic identification and a subsequent line-up identification because they were "tainted fruit" of the illegal arrest. The defendant also sought to exclude the victim's in-court identification testimony because his presence at trial was also traceable to the unlawful arrest. The Supreme Court rejected this argument, holding: "[Defendant] is not himself a suppressible 'fruit,' and the illegality of his detention cannot deprive the Government of the opportunity to prove his guilt through the introduction of evidence wholly untainted by the police misconduct." *Id.* at 474, 100 S.Ct. at 1251. The Court refused to adopt the deterrence rationale for an exclusionary rule that operates on the person of the defendant:

> "Our numerous precedents ordering the exclusion of such illegally obtained evidence assume implicitly that the remedy does not extend to barring the prosecution altogether. So drastic a step might advance marginally some of the ends served by exclusionary rules, but it would also increase to an intolerable degree interference with the public interest in having the guilty brought to book." [*United States v. Blue,* 384 U.S. 251, 255, 86 S.Ct. 1416, 1419, 16 L.Ed.2d 510 (1966).]

In some cases, of course, prosecution may effectively be foreclosed by the absence of the challenged evidence. But this contemplated consequence is the product of the exclusion of specific evidence tainted by the Fourth Amendment violation and is not the result of a complete bar to prosecution.

445 U.S. at 474 n. 20, 100 S.Ct. at 1251 n. 20.

Certainly, if there is no authority for barring the prosecution of a defendant who was illegally taken into custody, we are in no position to strip New York State of its power to try a defendant such as Brown, who was lawfully arrested and convicted on untainted evidence. *Cf. Ker v. Illinois,* 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886) and *Frisbie v. Collins,* 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952) (a court's power to try a person for a crime is not impaired by the forcible abduction of the defendant into the jurisdiction); *see also I.N.S. v. Lopez–Mendoza,* 468 U.S. 1032, 1039–40, 104 S.Ct. 3479, 3483–84, 82 L.Ed.2d 778 (1984); *United States v. Crews,* 445 U.S. at 474, 100 S.Ct. at 1251; *Stone v. Powell,* 428 U.S. 465, 485, 96 S.Ct. 3037, 3048, 49 L.Ed.2d 1067 (1976); *Gerstein v. Pugh,* 420 U.S. 103, 119, 95 S.Ct. 854, 866, 43 L.Ed.2d 54 (1975). As the district court here observed, "the purpose of such a remedy cannot be to relieve a criminal of punishment for the crime or crimes committed as compensation for wrongs done by representatives of the institutions of society." 803 F.Supp. at 949.

The remedy of dismissal is not required to vindicate Brown's due process rights. Other and more appropriate remedies are available among those enumerated by the district court. *Id. See also Matta–Ballesteros v. Henman,* 896 F.2d 255, 262 (7th Cir.) (*Bivens* action offers remedy for use of excessive force during arrest), *cert. denied,* 498 U.S. 878, 111 S.Ct. 209, 112 L.Ed.2d 169 (1990). Brown in fact pursued a civil remedy by bringing two section 1983 suits based on the beating incident. And, of course, criminal laws and penalties apply to the police as well as anyone else who commits assault. The district court properly concluded that it was not empowered to grant any further relief on Brown's habeas petition.

## II. Effective Assistance of Counsel

Brown argues that his Sixth Amendment right to counsel was violated in two ways: (1) federal law enforcement agents interviewed him without counsel present; and (2) his lawyers were ineffective because they employed a purported revolutionary strategy that precluded any cooperation with the authorities or any plea bargaining.

### A. Uncounseled Interviews with Federal Agents

It is undisputed that, while in federal custody in Otisville, Brown initiated a series of ten interviews with the FBI and that he did so against the advice of counsel. Each time Brown met with FBI agents, he signed a waiver of counsel form and stated that he did not want his attorney present. The FBI agents did not inform Brown's attorney that they were conducting the interviews; nor did the agents discuss the content of the interviews with New York law enforcement authorities, in light of New York State's constitutional prohibition against interviewing anyone under State indictment without the presence of counsel. The state court suppressed Brown's statements to the FBI and, at a post-trial hearing, found that none of the evidence offered to convict Brown arose from the FBI interviews. *See People v. Brown,* 136 A.D.2d 1, 9 n. 5, 525 N.Y.S.2d 618, 622 n. 5 (2d Dep't), *review denied,* 72 N.Y.2d 857, 532 N.Y.S.2d 507, 528 N.E.2d 897, *cert. denied,* 488 U.S. 897, 109 S.Ct. 240, 102 L.Ed.2d 229 (1988). Brown testified at the post-trial hearing that federal authorities offered no bargain and made no promises to gain his cooperation.

Brown does not contend that the state court improperly admitted evidence of his statements to the FBI, or that anyone reneged on a plea bargain. Brown claims prejudice on the theory that the FBI interviews interfered with his right to counsel at the plea bargaining stage because, without counsel, he did not know to withhold valuable information about his comrades until some offer of a plea was made to him. Brown thus asks us to adopt the rule that uncounseled post-indictment interrogation violates the Sixth Amendment, regardless of waiver, since uncounseled defendants may lose their best opportunity to barter their criminal intelligence for an advantage in plea or sentencing. Brown also claims that his injuries rendered him vulnerable at the time of the FBI interviews, and that the FBI tried to drive a wedge between him and his revolutionary counsel by branding him an informant. Because Brown cannot be restored to the position he occupied prior to his disclosures to federal authorities—as a holder of information in exchange for which the State might plea bargain—Brown claims that the only remedy for the alleged constitutional violations is dismissal of the indictment.

The State's response is threefold: that there was no violation of Brown's federal constitutional rights; that the remedy of dismissal is inappropriate; and that in any event, the state cannot be held to account for the initiatives of the federal agents. We do not reach the third issue because we find that Brown's constitutional rights were not violated and that dismissal is not warranted.

 Brown offers no basis to upset state court findings that he initiated the discussions with the FBI and expressly and competently waived his right to counsel each time he was interviewed. *See People v. Brown,* 136 A.D.2d at 11, 525 N.Y.S.2d at 623. In such circumstances, the Supreme Court has held that a defendant may be questioned without his attorney present. *Patterson v. Illinois,* 487 U.S. 285, 291, 108 S.Ct. 2389, 2394, 101 L.Ed.2d 261 (1988); *Smith v. Illinois,* 469 U.S. 91, 95, 105 S.Ct. 490, 492–93, 83 L.Ed.2d 488 (1984). In view of this authority, we decline to adopt a *per se* rule, implicitly urged by Brown, that bars interviewing a defendant in the absence of counsel if there is a possibility of a plea bargain. *Cf. United States v. Guido,* 704 F.2d 675, 678 (2d Cir.1983) (rejecting the "New York rule" which prohibits an uncounseled waiver of the Fifth Amendment privilege once formal adversary proceedings have begun).

 We similarly reject the suggestion that Brown's conscious decision to disregard legal advice impaired the adequacy of legal representation. The Sixth Amendment pro-

tection requires that counsel be effective, not that counsel be heeded. A competent defendant who disregards counsel may confess or otherwise undermine his own defense without creating by that deliberate conduct a basis under the federal constitution for later reversal of his conviction.

■ As to Brown's claim that the FBI exploited his injuries and subverted his relationship with his attorney, the issue is whether he knowingly and intelligently waived the right to counsel. Since the state court expressly found a valid waiver, this claim is unavailing. The record does not evidence government misconduct intended to interfere with the attorney-client relationship or otherwise dilute Brown's Sixth Amendment rights. *See Maine v. Moulton,* 474 U.S. 159, 171, 106 S.Ct. 477, 484–85, 88 L.Ed.2d 481 (1985); *United States v. Ginsberg,* 758 F.2d 823, 833 (2d Cir.1985).

■ In any event, Brown can hardly contend that the presence of any of his revolutionary lawyers would have facilitated a plea bargain. Brown concedes that, had a revolutionary lawyer been present at or aware of the FBI interviews, counsel's advice would have been *not* to cooperate or plea bargain. Under the circumstances, the input of Brown's chosen counsel might have precluded the FBI interviews, but would not have advanced a plea agreement.

■ Assuming *arguendo* that Brown's Sixth Amendment rights were violated, dismissal of the charges against him is not an appropriate remedy. In *United States v. Morrison,* 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981), the Supreme Court held that "[c]ases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *Id.* at 364, 101 S.Ct. at 668. In *Morrison,* federal agents met with a criminal defendant without her attorney's knowledge or permission, even though they were aware that she was under indictment and had counsel. Although the agents disparaged her defense counsel and urged her to cooperate, she declined and immediately notified

her attorney. The Supreme Court condemned the agents' behavior as "egregious," but found that it had no adverse impact upon the criminal proceeding: counsel's effectiveness was not undermined and the prosecution did not gain use of any tainted evidence. The Court held:

> Absent such impact on the criminal proceeding, ... there is no basis for imposing a remedy in that proceeding, which can go forward with full recognition of the defendant's right to counsel and to a fair trial.
>
> More particularly, absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate.... The remedy in the criminal proceeding is limited to denying the prosecution the fruits of its transgression.

*Id.* at 365–66, 101 S.Ct. at 668–69 (footnote omitted). Here, Brown has not demonstrated any impairment of representation or any unfairness at trial. The state court neutralized Brown's allegedly tainted statements to the FBI by suppressing them entirely. To the extent his cooperation with the FBI alienated his counsel, that effect resulted from a disagreement as to how to handle his case, not from any constitutional violation. There is no other "effect of a constitutional dimension which needs to be purged." *Id.* at 366, 101 S.Ct. at 669.

### B. *Representation by "Revolutionary Counsel"*

■ Brown claims that he was deprived of effective assistance of counsel because his lawyers during the first eighteen months of the criminal proceedings against him represented "conflicting interests." Specifically, Brown claims that his lawyer Evelyn Williams adopted a strategy of confronting the system, and abjured cooperation with law enforcement authorities or plea bargaining because she was more interested in advancing the revolutionary cause of his co-defendants than in representing his individual interests. This strategy allegedly placed Ms. Williams in conflict with the best interests of Brown, her client, who now claims that his cooperation with law enforcement

could have been deployed to achieve a more favorable outcome for him. Brown further claims that, when Ms. Williams moved to withdraw as counsel upon learning that he had cooperated with the FBI, the court improperly denied the motion for six months, leaving Brown isolated and "bereft of meaningful legal assistance."

Claims of ineffective assistance of counsel are governed by the two-prong test set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Brown must demonstrate that his counsel's performance fell below an objective standard of reasonableness and that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 687–88, 694, 104 S.Ct. at 2064–65, 2068.

With respect to the first prong of the *Strickland* test, counsel's performance is evaluated in light of a criminal defendant's burden to "overcome the strong presumption of attorney competence." *Kimmelman v. Morrison,* 477 U.S. 365, 383, 106 S.Ct. 2574, 2587, 91 L.Ed.2d 305 (1986). We initially observe that Brown does not claim that his counsel was incompetent or made unprofessional errors. Apparently, his claim is that she acted unreasonably in rejecting the opportunity to plea bargain.

 Plea bargaining is a critical stage of a criminal proceeding, during which the advice of counsel is important. *See Michigan v. Jackson,* 475 U.S. 625, 632–33, 106 S.Ct. 1404, 1408–09, 89 L.Ed.2d 631 (1986). Adequacy of counsel can be evaluated on the basis of a lawyer's performance at that stage of the proceeding. However, it is not necessary that the defendant have counsel who recommends that a plea bargain be pursued. *Cf. United States v. Cronic,* 466 U.S. 648, 657 n. 19, 104 S.Ct. 2039, 2045–46 n. 19, 80 L.Ed.2d 657 (1984) ("even when there is a bona fide defense, counsel may still advise his client to plea guilty if that advice falls within the range of reasonable competence under the circumstances"). Having selected confrontational counsel who found plea bargaining repugnant, Brown cannot claim that his lawyer was inadequate at that stage of the proceeding. Nor is it necessary that a defendant agree with his counsel's recom-

mendation. "[T]he appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such. If counsel is a reasonably effective advocate, he meets constitutional standards irrespective of his client's evaluation of his performance." *Id.* at 657 n. 21, 104 S.Ct. at 2046 n. 21.

Focusing on the adversarial process in Brown's case, we find that, regardless of counsel's motivations, she adopted a reasoned strategy to reject individual plea bargaining in favor of a joint defense, especially in view of the prosecutor's contemporaneous statements to the trial court and the press that he would not plea bargain with Brown. Brown's defense was in other respects conventional, thorough and tailored to his individual needs. His revolutionary counsel took purposeful and aggressive pretrial steps, including motions on Brown's behalf (to dismiss the indictment, for discovery and inspection, for suppression of evidence, and for changes in venue), and opposition to the prosecution's application for a corporeal lineup. Viewed as a whole, counsel's conduct falls within the wide range of reasonable professional assistance. *See United States v. Cruz,* 785 F.2d 399, 405 (2d Cir.1986) ("This type of pretrial work is quite demonstrative of the reasonableness of counsel's conduct.").

At no point was Brown entirely without counsel, as he seems to imply. The record indicates that Ms. Williams continued to represent Brown during the six month period after she unsuccessfully moved to withdraw. The trial court's initial refusal to allow Ms. Williams to withdraw was upheld by the state appellate court based on the lack of any "showing that [Ms. William's] interest [in the Movement] created a conflict which bore a relationship to the defense." *People v. Brown,* 136 A.D.2d at 12, 525 N.Y.S.2d at 624. We have no basis for refuting this ruling, which is additionally supported by the record of Ms. Williams' efforts on Brown's behalf and the fact that she was Brown's fourth attorney in a proceeding that was still over a year from trial when she made the motion.

■ With respect to the second prong of the *Strickland* test, a defendant must show that counsel's error, if any, had an effect on the outcome. Such prejudice will be presumed, however, where a defendant can "establish that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980). Ms. Williams' commitment to a joint defense strategy, according to Brown, amounted to an actual conflict of interest that prejudiced Brown by foreclosing a plea bargain. Whatever baggage Ms. Williams brought to Brown's case, she had no conflict of interest. Ms. Williams represented Brown only, and could therefore counsel him on whether to plead guilty or become a witness for the state, without regard to the interests of any other defendant. *See, e.g., Wheat v. United States*, 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). Ms. Williams made a reasoned decision to make common cause with other defendants and defense counsel; whether or not that decision was motivated by revolutionary solidarity, it was arrived at free of any legal or ethical obligation to any defendant but Brown.

### III. Competence to Stand Trial

The initial phases of Brown's trial went forward before completion of the psychiatric evaluation and court hearing that determined Brown's competence to stand trial. The trial court found, based on expert medical testimony, that Brown understood the nature of the charges against him and was able to assist in his own defense at all stages of the trial. Brown offers no adequate basis for disturbing these findings. Brown claims, however, that the court's refusal to adjourn the trial pending the outcome of the competence proceedings violated due process.

■ The fact that the court made the competence finding *during* (rather than in advance of) the trial means only that the court might have had to declare a mistrial, a calculated risk that the court presumably undertook on the basis of its own observations of Brown and its desire to preserve the hard-won progress already made in jury selection in this highly publicized case. Since Brown was found competent and able to assist counsel, it matters not that this judgment was made during trial. *See Drope v. Missouri*, 420 U.S. 162, 182, 95 S.Ct. 896, 909, 43 L.Ed.2d 103 (1975) (post-trial competence hearing "may have advantages, at least where the defendant is present at the trial and the appropriate inquiry is implemented with dispatch").

### IV. Security Measures at Trial

■ Brown claims that "extraordinary" security measures at the Westchester County Courthouse undermined the presumption of innocence and denied him a fair trial. Brown also claims that the trial court wrongfully refused to give him a copy of the sealed security report recommending security measures. The security measures taken at a state courthouse are so peculiarly within the purview and discretion of the state judiciary as to be beyond review on a habeas petition except where there is a strong showing that the measures taken were "inherently prejudicial" and the defendant suffered "actual prejudice." *Holbrook v. Flynn*, 475 U.S. 560, 572, 106 S.Ct. 1340, 1347, 89 L.Ed.2d 525 (1986) (four uniformed state troopers in courtroom not prejudicial); *see also United States v. Maldonado–Rivera*, 922 F.2d 934, 971 (2d Cir.1990) (trial court has broad discretion to employ security measures, including maintaining juror anonymity, providing secure transportation for jurors to and from court, and posting "substantial numbers of armed guards on the premises," where "concerns for safety were grounded in objective facts"), *cert. denied*, —— U.S. ——, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991).

The factual record justifying the safety concerns of the trial court is extensive. There is no basis whatsoever for Brown's suggestion that the security measures were gratuitously adopted for the ulterior purpose of prejudicing the outcome of the trial. In this case of appalling violence committed by self-proclaimed revolutionaries waging war on their community, the trial court displayed a measured appreciation of the need to protect all participants in the proceedings—including Brown, a one-time FBI informant.

The record indicates that, outside the courthouse, concrete barriers were in view, but police dogs were situated where jurors would not see them and marked police cars were parked out of sight. Entry to the courthouse was by the back door only and four metal detectors were stationed in the lobby through which all persons, not just those associated with Brown's trial, were required to pass. One elevator was reserved for those attending Brown's trial, operated by a court officer uniformed and armed in the same way as every other court officer. Persons entering the courtroom were screened with a hand-held metal detector. Inside the courtroom there were two court officers to assist witnesses to and from the witness stand and to transfer documents among the participants, as in every case. At times, three additional court officers were stationed at the rear of the courtroom to assist with an overflow crowd of spectators. One officer was placed in the immediate vicinity of Brown. During voir dire, potential jurors were screened for whether the visible security measures would affect their ability to render an impartial verdict. The presence of guards and the use of metal detectors do not furnish grounds for habeas relief.

▉ We reject Brown's claim that he was entitled to review the sealed security report in order to frame his arguments with respect to the security measures. Specifically, Brown argues that he has a right to know what security measures were employed in areas off limits to him and his counsel, but visible to jurors and therefore possibly prejudicial. However, Brown's counsel attended hearings regarding the issue of security at which the trial court described generally all security measures and offered (and solicited) suggestions to neutralize their possible prejudicial effect. His counsel also participated in the voir dire of potential jurors designed to negate possible prejudice arising from the security measures. Nothing in the public record indicates that there were any security measures visible to jurors but concealed from Brown or his counsel. In any event, on habeas review, the district court examined the security report *in camera* and found that disclosure was not justified; this procedure is adequate to protect due process and the ad-

versarial system. Nothing in the Constitution requires the state courts to share with defendants or their lawyers (revolutionary or otherwise) reports concerning courthouse security.

V. Impartiality of the Presiding Judge

▉ The trial judge ran for reelection soon after Brown's trial and, in his campaign literature, touted the conviction and tough sentence in this Brink's case. Brown argues that the trial judge's post-conviction conduct impugns the impartiality of the tribunal and violates due process. Brown claims that the conduct and rulings of the trial judge during the criminal proceedings, while not overtly biased, should be deemed biased retrospectively because of the possibility that his conduct and rulings were tainted by political motives.

▉ "[M]ost matters relating to judicial disqualification [do] not rise to a constitutional level." *FTC v. Cement Institute*, 333 U.S. 683, 702, 68 S.Ct. 793, 804, 92 L.Ed. 1010 (1948). *See Tumey v. Ohio*, 273 U.S. 510, 523, 47 S.Ct. 437, 441, 71 L.Ed. 749 (1927) ("matters of kinship, personal bias, state policy, remoteness of interest, would seem generally to be matters merely of legislative discretion"). Mere allegations of judicial bias or prejudice do not state a due process violation. *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 820, 106 S.Ct. 1580, 1584, 89 L.Ed.2d 823 (1986). The constitutional validity of a judge's qualifications is not implicated unless the judge has a "direct, personal, substantial, pecuniary interest" in reaching a particular conclusion in a case. *Tumey*, 273 U.S. at 523, 47 S.Ct. at 441.

In New York State, some judges are appointed and some are elected. Whatever the advantages may be of electing judges, no one can be surprised if campaign literature exploits community concern about crime. What the trial judge said during his reelection may well justify disapproval by the bar, the state legislature or a discerning electorate, but it is not fundamentally different from the kind of appeal that elected judges make when they urge that they are tough on crime, or compassionate, or strict with polluters.

The campaign literature of the type at issue here did not create, *post hoc,* a disqualifying interest of constitutional dimension.

Brown claims that a causal relationship between the trial judge's electioneering and his earlier trial rulings can be inferred here because of the strict security at trial, unspecified trial rulings, and the imposition of a maximum sentence. None of these circumstances evidences partiality. There is ample record support for the security measures and the sentence, and overwhelming evidence of Brown's guilt. On oral argument, Brown's attorney conceded that, to reverse Brown's conviction, this Court would have to rule in effect that no judge who is elected may preside in sensational cases. We reject such a rule as incompatible with federalism. We refuse to assume, as Brown asks us to do, that all elected judges will invariably disregard their oath and subvert justice in cases like his.

Brown alternatively argues that habeas relief should be granted in his case for its prophylactic effect on elected judges, who will then be forewarned that they may not exploit a trial to enhance electability. The habeas remedy is not ours to grant unless a petitioner has established a constitutional violation affecting the validity of the verdict. *See United States v. Morrison,* 449 U.S. 361, 366, 101 S.Ct. 665, 669, 66 L.Ed.2d 564 (1981). We have no warrant here to reform according to our lights the electoral system for state judges.

VI. Other

Brown urges a number of additional grounds for relief that are properly before us on this appeal. Among other things, he claims that he was entitled to yet a third change of venue, that the mental competence ruling failed to take into account his physical condition and his brief re-incarceration in the Rockland County Jail, that he was entitled to removal for cause of jurors with police relatives, and that the trial court improperly curtailed the defense summation. We find these claims lacking in merit and reject them substantially for the reasons set forth in the district court opinion.

CONCLUSION

Brown's claims do not provide a federal constitutional basis for his release or for vacating his state court conviction; we therefore affirm the district court's denial of a writ of habeas corpus.